HOFFMAN *v.* UNITED STATES.

No. 513.   Argued April 25, 1951.—Decided May 28, 1951.

*William A. Gray* argued the cause for petitioner. With him on the brief was *Lester J. Schaffer.*

*John F. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney* and *J. F. Bishop.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner has been convicted of criminal contempt for refusing to obey a federal court order requiring him to answer certain questions asked in a grand jury investigation. He raises here important issues as to the application of the privilege against self-incrimination under the Fifth Amendment, claimed to justify his refusal.

A special federal grand jury was convened at Philadelphia on September 14, 1950, to investigate frauds upon the Federal Government, including violations of the customs, narcotics and internal revenue liquor laws of the United States, the White Slave Traffic Act, perjury, bribery, and other federal criminal laws, and conspiracy to commit all such offenses. In response to subpoena petitioner appeared to testify on the day the grand jury was empaneled, and was examined on October 3. The pertinent interrogation, in which he refused to answer, follows:

"Q. What do you do now, Mr. Hoffman?

"A. I refuse to answer.

"Q. Have you been in the same undertaking since the first of the year?

"A. I don't understand the question.

"Q. Have you been doing the same thing you are doing now since the first of the year?

"A. I refuse to answer.

"Q. Do you know Mr. William Weisberg?

"A. I do.

"Q. How long have you known him?

"A. Practically twenty years, I guess.

"Q. When did you last see him?

"A. I refuse to answer.

"Q. Have you seen him this week?

"A. I refuse to answer.

"Q. Do you know that a subpoena has been issued for Mr. Weisberg?

"A. I heard about it in Court.

"Q. Have you talked with him on the telephone this week?

"A. I refuse to answer.

"Q. Do you know where Mr. William Weisberg is now?

"A. I refuse to answer."

It was stipulated that petitioner declined to answer on the ground that his answers might tend to incriminate him of a federal offense.

Petitioner's claim of privilege was challenged by the Government in the Federal District Court for the Eastern District of Pennsylvania, which found no real and substantial danger of incrimination to petitioner and ordered him to return to the grand jury and answer. Petitioner stated in open court that he would not obey the order, and on October 5 was adjudged in criminal contempt and sentenced to five months imprisonment. 18 U. S. C. § 401; Federal Rule of Criminal Procedure 42 (a).

Petitioner appealed to the Court of Appeals for the Third Circuit, where the record was docketed on October 11. After denial by the District Court of his request for bail pending appeal, petitioner on October 20 filed in that court a "Petition for Reconsideration of Allowance of Bail Pending Appeal," alleging that "on the basis of the facts contained in his affidavit, attached . . . , he was justified in his refusal to answer the questions as aforesaid, or, in any event, that there is so substantial a question involved that your petitioner should be released on bail . . . ." In the accompanying affidavit petitioner asserted that

> "He assumed when he refused to answer the questions involved before the Grand Jury, that both it and the Court were cognizant of, and took into consideration, the facts on which he based his refusals to answer.
>
> "He has since been advised, after his commitment, that the Court did not consider any of said facts upon which he relied and, on the contrary, the Court considered only the bare record [of the questions and answers as set out above].

"In the interest of justice and particularly in aid of a proper determination of the above petition, he submits the following in support of his position that he genuinely feared to answer the questions propounded:

"(a) This investigation was stated, in the charge of the Court to the Grand Jury, to cover 'the gamut of all crimes covered by federal statute.' . . .

"(b) Affiant has been publicly charged with being a known underworld character, and a racketeer with a twenty year police record, including a prison sentence on a narcotics charge. . . .

"(c) Affiant, while waiting to testify before the Grand Jury, was photographed with one Joseph N. Bransky, head of the Philadelphia office of the United States Bureau of Narcotics. . . .

"(d) Affiant was questioned concerning the whereabouts of a witness who had not been served with a subpoena and for whom a bench warrant was sought by the Government prosecutor. . . .

"On the basis of the above public facts as well as the facts within his own personal knowledge, affiant avers that he had a real fear that the answers to the questions asked by the Grand Jury would incriminate him of a federal offense."

Included as appendices to the affidavit were clippings from local newspapers, of dates current with the grand-jury proceeding, reporting the facts asserted in the affidavit. On October 23 the District Court allowed bail. On the following day the petition for reconsideration of allowance of bail, including affidavit and appendices, was filed in the Court of Appeals as a supplemental record on appeal. The Government moved to strike this matter on the ground that it was not properly part of the appeal record.

The Court of Appeals granted the motion to strike and affirmed the conviction. 185 F. 2d 617 (1950). With respect to the questions regarding Weisberg, the court held unanimously that "the relationship between possible admissions in answer to the questions . . . and the proscription of [pertinent federal criminal statutes (18 U. S. C. §§ 371, 1501)] would need to be much closer for us to conclude that there was real danger in answering." As to the questions concerning petitioner's business, the court observed that "It is now quite apparent that the appellant could have shown beyond question that the danger was not fanciful." In the court's view the data submitted in the supplemental record "would rather clearly be adequate to establish circumstantially the likelihood that appellant's assertion of fear of incrimination was not mere contumacy." But the Court of Appeals concluded, again unanimously, that the information offered in support of the petition for reconsideration of bail "was not before the court when it found appellant in contempt, and therefore cannot be considered now." Thus limited to the record originally filed, the majority of the court was of the opinion, with respect to the business questions, that "the witness here failed to give the judge any information which would allow the latter to rule intelligently on the claim of privilege for the witness simply refused to say anything and gave no facts to show why he refused to say anything." One judge dissented, concluding that the District Court knew that "the setting of the controversy" was "a grand jury investigation of racketeering and federal crime in the vicinity" and "should have adverted to the fact of common knowledge that there exists a class of persons who live by activity prohibited by federal criminal laws and that some of these persons would be summoned as witnesses in this grand jury investigation."

Petitioner unsuccessfully sought rehearing in the Court of Appeals, urging remand to the District Court to permit reconsideration of the conviction on the basis of data in the supplemental record. We granted certiorari, 340 U. S. 946 (1951).

This is another of five proceedings before this Court during the present Term in each of which the privilege against self-incrimination has been asserted in the course of federal grand-jury investigations.* A number of similar cases have been considered recently by the lower courts. The signal increase in such litigation emphasizes the continuing necessity that prosecutors and courts alike be "alert to repress" any abuses of the investigatory power invoked, bearing in mind that while grand juries "may proceed, either upon their own knowledge or upon the examination of witnesses, to inquire . . . whether a crime cognizable by the court has been committed," *Hale* v. *Henkel,* 201 U. S. 43, 65 (1906), yet "the most valuable function of the grand jury . . . [has been] not only to examine into the commission of crimes, but to stand between the prosecutor and the accused," *id.* at 59. Enforcement officials taking the initiative in grand-jury proceedings and courts charged with their superintendence should be sensitive to the considerations making for wise exercise of such investigatory power, not only where constitutional issues may be involved but also where the noncoercive assistance of other federal agencies may render it unnecessary to invoke the compulsive process of the grand jury.

The Fifth Amendment declares in part that "No person . . . shall be compelled in any criminal case to be a wit-

---

*(Patricia)* *Blau* v. *United States,* 340 U. S. 159 (1950); *(Irving)* *Blau* v. *United States,* 340 U. S. 332 (1951); *Rogers* v. *United States,* 340 U. S. 367 (1951); *United States* v. *Greenberg,* 187 F. 2d 35 (C. A. 3d Cir. 1951), petition for writ of certiorari pending. [See *post,* p. 944.]

ness against himself." This guarantee against testimonial compulsion, like other provisions of the Bill of Rights, "was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed." *Feldman* v. *United States,* 322 U. S. 487, 489 (1944). This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure. *Counselman* v. *Hitchcock,* 142 U. S. 547, 562 (1892); *Arndstein* v. *McCarthy,* 254 U. S. 71, 72–73 (1920).

The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. *(Patricia) Blau* v. *United States,* 340 U. S. 159 (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason* v. *United States,* 244 U. S. 362, 365 (1917), and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers* v. *United States,* 340 U. S. 367 (1951), and to require him to answer if "it clearly appears to the court that he is mistaken." *Temple* v. *Commonwealth,* 75 Va. 892, 899 (1881). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked,

that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." See Taft, J., in *Ex parte Irvine,* 74 F. 954, 960 (C. C. S. D. Ohio, 1896).

What were the circumstances which the District Court should have considered in ruling upon petitioner's claim of privilege? This is the background as indicated by the record:

The judge who ruled on the privilege had himself impaneled the special grand jury to investigate "rackets" in the district. He had explained to the jury that "the Attorney General's office has come into this district to conduct an investigation . . . [that] will run the gamut of all crimes covered by federal statute." "If rackets infest or encrust our system of government," he instructed, "just as any blight attacks any other growth, it withers and dies. . . ." Subpoenas had issued for some twenty witnesses, but only eleven had been served; as the prosecutor put it, he was "having trouble finding some big shots." Several of those who did appear and were called into the grand-jury room before petitioner had refused to answer questions until ordered to do so by the court. The prosecutor had requested bench warrants for eight of the nine who had not appeared the first day of the session, one of whom was William Weisberg. Petitioner had admitted having known Weisberg for about twenty years. In addition, counsel for petitioner had advised the court that "It has been broadly published that [petitioner] has a police record."

The court should have considered, in connection with the business questions, that the chief occupation of some persons involves evasion of federal criminal laws, and

that truthful answers by petitioner to these questions might have disclosed that he was engaged in such proscribed activity.

Also, the court should have recognized, in considering the Weisberg questions, that one person with a police record summoned to testify before a grand jury investigating the rackets might be hiding or helping to hide another person of questionable repute sought as a witness. To be sure, the Government may inquire of witnesses before the grand jury as to the whereabouts of unlocated witnesses; ordinarily the answers to such questions are harmless if not fruitless. But of the seven questions relating to Weisberg (of which three were answered), three were designed to draw information as to petitioner's contacts and connection with the fugitive witness; and the final question, perhaps an afterthought of the prosecutor, inquired of Weisberg's whereabouts at the time. All of them could easily have required answers that would forge links in a chain of facts imperiling petitioner with conviction of a federal crime. The three questions, if answered affirmatively, would establish contacts between petitioner and Weisberg during the crucial period when the latter was eluding the grand jury; and in the context of these inquiries the last question might well have called for disclosure that Weisberg was hiding away on petitioner's premises or with his assistance. Petitioner could reasonably have sensed the peril of prosecution for federal offenses ranging from obstruction to conspiracy.

In this setting it was not *"perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency"* to incriminate. *Temple* v. *Commonwealth,* 75 Va. 892, 898 (1881), cited with approval in *Counselman* v. *Hitchcock,* 142 U. S. 547, 579–

580 (1892). See also, *Arndstein* v. *McCarthy,* 254 U. S. 71 (1920).

This conclusion is buttressed by the supplemental record. It showed that petitioner had a twenty-year police record and had been publicly labeled an "underworld character and racketeer"; that the Senate Crime Investigating Committee had placed his name on a list of "known gangsters" from the Philadelphia area who had made Miami Beach their headquarters; that Philadelphia police officials had described him as "the king of the shore rackets who lives by the gun"; that he had served a sentence on a narcotics charge; and that his previous conviction was dramatized by a picture appearing in the local press while he was waiting to testify, in which petitioner was photographed with the head of the Philadelphia office of the United States Bureau of Narcotics in an accusing pose.

It appears that the petition which comprised the supplemental record, though captioned a "Petition for Reconsideration of Allowance of Bail Pending Appeal," was by its terms an application to the District Court to vacate the contempt order on constitutional grounds, and alternatively a second motion for bail. Clearly this petition, filed but two weeks after the contempt order, was directed to the power of the committing court to discharge the contemnor for good cause—a power which courts should be solicitous to invoke when important constitutional objections are renewed. Cf. *Gouled* v. *United States,* 255 U. S. 298 (1921). The ends of justice require discharge of one having such a right whenever facts appear sufficient to sustain the claim of privilege. Accordingly the supplemental record should have been considered by the Court of Appeals.

For these reasons we cannot agree with the judgments below. If this result adds to the burden of diligence and efficiency resting on enforcement authorities, any other

conclusion would seriously compromise an important constitutional liberty. "The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime." *United States* v. *White,* 322 U. S. 694, 698 (1944). Pertinent here is the observation of Mr. Justice Brandeis for this Court in *McCarthy* v. *Arndstein,* 266 U. S. 34, 42 (1924): "If Congress should hereafter conclude that a full disclosure . . . by the witnesses is of greater importance than the possibility of punishing them for some crime in the past, it can, as in other cases, confer the power of unrestricted examination by providing complete immunity."

*Reversed.*

MR. JUSTICE REED dissents. He agrees with the conclusions reached by Judges Goodrich and Kalodner as expressed in the opinion below.