UNITED STATES of America, Appellee,

v.

Nathan GORDON, Defendant-Appellant.

No. 397, Docket 24180.

United States Court of Appeals Second Circuit.

Argued July 17, 1956.

Decided Sept. 12, 1956.

Paul W. Williams, U. S. Atty., for the Southern District of New York, New York City, for the United States, appellee. Herbert M. Wachtell, Arthur H. Christy, New York City, Fioravante G. Perrotta, Lynbrook, N. Y., and Charles H. Miller, Asst. U. S. Attys., New York City, of counsel.

Jesse Moss, New York City, for defendant-appellant.

Before CLARK, Chief Judge, and FRANK and LUMBARD, Circuit Judges.

Defendant is secretary-treasurer of Local 651 of the International Brotherhood of Teamsters. A special federal grand jury, duly impaneled in the Southern District of New York to investigate alleged racketeering in the garment and trucking industries, served defendant with two subpoenas: One was personal, the other was a subpoena *duces tecum* calling for certain books and records of Local 651. When defendant appeared before the grand jury he did not produce the books and records. He answered all questions concerning them, testifying that he had never seen them and did not have them in his possession.

Questioned about the union and its activities and affairs, he answered these questions:

"Q. Mr. Gordon, are you the Secretary-Treasurer of Local 651 of the International Brotherhood of Teamsters?"

"Q. Does Local 651 have a telephone?"

"Q. Mr. Gordon, are you connected with any union other than Local 651?"

"Q. Were you ever a member of any other Union?"

"Q. Where are the offices of Local 651?"

On the ground that his answers might tend to incriminate him, he refused to answer the following questions:

"Q. Have you ever seen the original letter of which Grand Jury Exhibit 6 is a photostat?" [1]

1. Exhibit 6 is as follows:

"Warehouse and Processing Employees Union
Local 651
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen & Helpers of America

19 W. Colombia Street
West Hempstead, L.I.
Ivanhoe 1-9112
November 29th, 1955.

Joint Council #16
Martin T. Lacey, President
265 West 14th Street
New York, N.Y.

Dear Sir & Brother:
We herewith submit the names and titles of the officers of Local Union #651, and request that same be seated as delegates to Joint Council #16.

| | |
|---|---|
| Hyman Supnick | President |
| Frank Alongi | Vice-President |
| Nathan Gordon | Secy. Treas. |
| Joseph Migelino | Recording Secy. |
| Abe Hodes | Trustee |
| Joseph Monica | " |
| Nathan Rosen | " |

NG/mw

Fraternally yours,
Nathan Gordon /s/
Nathan Gordon, Secy. Treas."

"Q. Do you pay dues?"

"Q. How many members are there in Local 651, if you know?"

"Q. How did you become Secretary-Treasurer of Local 651?"

"Q. Were you elected Secretary-Treasurer?"

"Q. To your knowledge has Local 651 ever had any election of officers?"

The judge held a hearing at which defendant testified and at which the following appeared: The subpoena served upon the defendant-appellant stated that the purpose of the investigation was to secure evidence as to an alleged violation of 18 U.S.C. § 371, the conspiracy statute. An Assistant United States Attorney, handling the matter, testified that the purpose of the Grand Jury Inquiry was to seek to establish a violation of the United States Criminal Code and that the questions asked of the defendant were material to the purpose of the investigation, i.e., establishing the commission of a crime. He further testified:

"Q. And yet you consider these questions concerning the organization of a paper local were relevant to the proof of commission of a crime, didn't you so testify? A. Certainly; they possibly may be material to the relevant purpose of the Grand Jury, yes."

He also testified that the Government was investigating the formation of a number of unions of which Local 651 was one, that the purpose of such investigation was "to hope to uncover criminal violations," and that defendant had testified that he was an official of one of the unions the Government was investigating.

Before calling the defendant, the government had in its possession certain documents indicating the participation of the defendant in the activities under investigation, and it introduced them in evidence before the Grand Jury. One was the photostat of a letter, Exhibit 6, purportedly signed by defendant, submitting certain names and asking for the seating of certain delegates. As noted above, one of the questions which defendant refused to answer asked him to connect himself with that letter. The United States Attorney testified he had believed that the Gordon who signed this was the defendant. The defendant testified that he claimed his privilege in good faith because he felt apprehensive by reason of the foregoing, and also because of a statement made by Judge Palmieri of the United States District Court for the Southern District of New York, who had heard another civil aspect of these activities of these Union Locals, and who had described the activities of these Locals and their organization as being "tainted with fraud." For these reasons, the defendant said, he felt that he had answered all of the questions which he could answer with safety and felt compelled to claim his privilege as to the rest.

The judge then ordered defendant to answer, before the Grand Jury, the questions he had previously refused to answer. For defendant's failure to comply with this order, the judge held defendant in contempt, and sentenced him for a prison term of six months.[2] Defendant has appealed.

FRANK, Circuit Judge.

1. As we have several times noted previously, our function (as an inferior court) is often to serve as a judicial moon, reflecting, as best we can, light from the sun of our system.[3] The latest shaft of light from that source, in the direction of a case like this, is Trock v. United States, 351 U.S. 976, 76 S.Ct. 1048. There, in a *Per Curiam*, reversing, without opinion, this court's decision in 2 Cir., 232 F.2d 839, the Supreme Court cited but one case, Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.

2. The order provided that defendant "may purge himself before the grand jury only and within five months."

3. The metaphor, of course, is inexact: Absent a clear light from our sun, we must frequently generate our own light.

Ed. 1118. In Hoffman, the Court said that the privilege is available unless it is "perfectly clear" that the witness is mistaken and that the answer "cannot possibly" tend to incriminate. The government contends that the facts in Hoffman were substantially unlike those here. But the same could have been said of the facts in Trock.[4]

Doubtless for a good reason the prosecutor was unwilling to specify any particular substantive crime which might become the basis of a conspiracy indictment resulting from the grand jury investigation, saying merely that the investigation was being conducted in the "hope to uncover criminal violations." On that account, however, defendant might reasonably have feared that he would be indicted for a conspiracy involving the fraudulent use of a "paper" local union, including, *inter alia,* a violation of the mail fraud statute, 18 U.S.C. § 1341. His lawyer may have told him of the dangers, resulting from the drag-net character of a conspiracy trial, described by Mr. Justice Jackson, dissenting in Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790. In such circumstances, we cannot say it was "perfectly clear" that defendant was mistaken in his apprehension that answers of the questions could "possibly" have a tendency to incriminate him.[5] We must not forget that, historically, a prime stimulus to the creation of the constitutional privilege came from opposition to inquiries addressed to persons not yet charged with a specific crime.[6]

2. The government stresses the fact that, at the hearing, "the government stated unequivocally that it had no present intention of indicting Gordon." But that intention could not bind the government if later it decided to seek defendant's indictment.

■ 3. The government urges that a decision sustaining the privilege in a case like this will seriously impair the utilty of every future grand jury investigation as a means of obtaining evidence with which to indict and convict criminals. That argument cuts too far: It would yield the patently illegal repeal by judges of the constitutional provision guaranteeing the anti-self-incrimination privilege. That provision unquestionably does sometimes impede enforcement of the criminal laws. But that was one of the clear purposes of the constitutional privilege, i. e., to prevent a court from compelling a witness—who might or not be a criminal—to give testimony which might incriminate him.[7] All privileges not to testify have the same impeding effect. This fact was emphasized by Bentham, the first doughty foe of the anti-self-incrimination privilege. He depicted it as an absurd interference with the expeditious punishment of criminals. But, on the same grounds, he argued for the abandonment of the client-lawyer privilege.[8] Yet few today want that privilege abandoned, although it enjoys no explicit constitutional protection.

What the government contends with respect to the Fifth Amendment privilege applies with equal force to the im-

4. Indeed a majority of a panel of this court said just that in United States v. Trock, 2 Cir., 232 F.2d at pages 842–843.

5. See Chief Justice Marshall in United States v. Burr, 25 Fed.Cas. pages 38, 40, No. 14,692e; cf. United States v. Weisman, 2 Cir., 111 F.2d 260, 262; United States v. Cusson, 2 Cir., 132 F. 2d 413, 414.

6. See, e. g., Wigmore, Evidence (3d ed.) Section 2250; Morgan, The Privilege Against Self-Incrimination, 34 Minn.L. Rev. (1949) 1; United States v. St. Pier-

re, 2 Cir., 132 F.2d 837, 840, 147 A.L.R. 240 (dissenting opinion).

7. See, e. g., Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Usher, The Rise and Fall of The High Commission (1913); Frank, If Men Were Angels (1942), 240–250; Pittman, The Colonial and Constitutional History of The Privilege Against Self-Incrimination in America, 21 Va.L.Rev. (1935) 763; United States v. St. Pierre, 2 Cir., 132 F.2d 837, 840, 842, 846, 147 A.L.R. 240 (dissenting opinion).

8. See Bentham, Rationale of Judicial Evidence, Bk. IX, pt. IV, Ch. 5.

munity, from unreasonable searches and seizures, guaranteed by the Fourth Amendment.[9] It, too, often becomes a barrier to crime investigation, as when evidence slips away because the police may not promptly search without a warrant.

■ American prosecutors must learn to adjust themselves to these obstacles. The purpose of the Bill of Rights was, as Madison declared, " 'to oblige the government to control itself.' "[10] We are committed to the principle that any method of pursuing suspected criminals must give way when it clashes with these constitutional guarantees. The framers of the Constitutional Amendments thought those guarantees embodied an even more important policy than that of detecting and punishing crime. Considered solely in terms of procedure, those constitutional safeguards seem logically indefensible. Considered, however, as conferring substantive rights, they assume a different significance: They express the high value our democracy puts on the individual's right of privacy. "Traditionally, Anglo-American law values the individual's life and freedom so highly that the interest of the state in discovering and punishing wrong-doers is subordinated to the right of the accused to remain a passive spectator of the fact of his wrongdoing."[11]

At any such right of privacy, be it noted, the despotic rulers of totalitarian regimes sneer. They denounce all privacy, since it blocks efficient enforcement of criminal laws.[11a] Their position, which logically renders asinine any privilege not to testify, necessarily justifies them logically in subjecting their sub-

jects to constant spying and snooping; for such despotic surveillance plainly aids in the detection of those who violate the laws. Our democratic concern with privacy, they call characteristic of our decadent culture. Before we accept their criticism, and sacrifice all our other values to effective law enforcement, we should reflect on the brutal consequences of the totalitarians' alleged efficiency in pursuing suspected criminals. Such reflection should teach us this: An overzealous prosecutor's heaven may be everyone else's hell.[12]

■ 4. The government argues that answers at least to some of the questions, when taken singly, are remote from any tendency to incriminate. Even so assuming *arguendo*, we reject that argument for these reasons: The questions together form such a cluster as to interrelated matters that to separate out any one of them, treating it as if it stood alone, would be to artificialize the actualities. Moreover, although that same situation existed in Trock's case, the Supreme Court did not deal with any one of the questions singly but sustained the privilege as to all. This court's opinion in United States v. Curcio, 2 Cir., 1956, 234 F.2d 470, is distinguishable on its facts; besides, that opinion was uttered before the Supreme Court's decision in Trock.

Reversed.

LUMBARD, Circuit Judge (concurring).

In the setting in which Gordon, Secretary-Treasurer of Local 651, was asked

9. See, e. g., Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Counselman v. Hitchcock, 142 U.S. 547, 581, 12 S.Ct. 195, 35 L.Ed. 1110.

10. See Brock v. United States, 5 Cir., 223 F.2d 681, 684.

11. 55 Col.L.Rev. (1955) 527, 542.

11a. Cf. Williams v. Kaiser, 323 U.S. 471, 476, 65 S.Ct. 363, 89 L.Ed. 398.

12. Cf. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Counselman v. Hitchcock, 142 U.S. 547, 580–581, 12 S.Ct. 195, 35 L.Ed. 1110; Brock v. United States, 5 Cir., 223 F.2d 681, 684–685; Holmes, J., dissenting in Olmstead v. United States, 277 U.S. 438, 469, 470–471, 48 S.Ct. 564, 72 L.Ed. 944.

the questions before the special grand jury, it is not difficult to conclude that he had "reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118. Judge Palmieri's comment in the civil aspect of the activities of the unions under investigation, among which was Local 651, that the activities were "tainted with fraud" could fairly be claimed as a cause of apprehension.

Even so, had the questioning been limited to the existence of books and records, their production and their whereabouts, Gordon would have had to answer such questions. United States v. Curcio, 2 Cir., 1956, 234 F.2d 470. And the fact that answers to such questions might tend to incriminate him individually would have been no defense. United States v. White, 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 and Rogers v. United States, 1951, 340 U.S. 367, 71 S. Ct. 438, 95 L.Ed. 344. I think it is quite clear that the Supreme Court's *per curiam* reversal of Trock v. United States, 1956, 351 U.S. 976, 76 S.Ct. 1048, on the authority of Hoffman, casts no doubt on the Curcio decision. The questions in both Trock and Hoffman dealt with activities and associations of the witness, whereas Curcio was asked only about books and records.

Here Gordon was asked questions which went beyond the identity and whereabouts of the records. And the answers to those questions might reasonably cause Gordon to be convinced that they would be used against him, if the charge were to be made that a union had been taken over, or that a paper union had been created, for the purpose of extortion in violation of 18 U.S.C.A. § 1951, the Anti-Racketeering Law. This is all that we need to decide or need to say.