UNITED STATES of America, Appellee,

v.

Sam COURTNEY, Defendant-Appellant.

No. 398, Docket 24185.

United States Court of Appeals Second Circuit.

Argued July 17, 1956.

Decided Sept. 20, 1956.

---

On March 29, 1956, a Special Grand Jury was duly impaneled in the Southern District of New York to investigate allegations of racketeering in the garment and trucking industries.

On April 10, May 3, May 10, May 22 and June 26, 1956, defendant appeared as a witness and testified before this Grand Jury. He is a partner in Courtney Trucking Company, a firm engaged in business in the New York City "garment center." He was interrogated at length about the overall operations of his company and until the appearance of June 26, 1956 gave answers to the questions posed.

A specific area of inquiry upon which the questioning centered was the expenditure by the trucking company of large sums of money averaging $15,000 to $20,000 a year—unsupported by vouchers—the major portion of which was claimed by Courtney's testimony to have consisted of gratuities supposedly paid out in the course of business.

On June 26, 1956, the defendant testified that he himself distributed portions of these monies on daily visits to various persons in the many packing houses and buildings in which his company deals.

Then questioned as to his activities of the past week (*i.e.*, June 18–22, 1956), he answered that he had visited ten packing houses and several buildings, giving gratuities in each case to checkers, freight-elevator starters, assistant starters and operators. Further interrogation exacted names of particular packing houses and buildings at which such payments were supposedly made. However, when asked to give the names of the recipients, he refused to answer,[1] stating as his reasons: "That it affects my business"; "that it will impair my business"; that "there is no one who receives the money that will admit it"; and that "if we do tell, the man who receives it, the man will lose his job."

Upon recommendation of the Assistant United States Attorney, the witness was then excused by the Grand Jury Foreman to consult with counsel in the ante-

---

1. Among the questions to which witness then refused answers are the following:

"Q. Who did you give money to last week at National Packing?"

"Q. Whom did you give money to last week at Fast Service?"

"Q. Who did you give money to last week, sir, at Gem?"

"Q. Who did you give money to last week at Interstate?"

"Q. Who did you give money to last week at any other packing house?"

"Q. To whom did you pay money at 463 Seventh Avenue?"

"Q. Did you pay to only one person seven or eight times or did you pay more than one person?"

"Q. Referring to 463 Seventh Avenue, how much money did you pay last week?"

"Q. Which freight elevator operators did you pay money to at 463 Seventh Avenue last week?"

"Q. Which starter did you pay money to at 463 Seventh Avenue last week?"

"Q. To whom, sir, did you pay money at 462 Seventh Avenue last week?"

room. Upon his return to the Grand Jury room, Courtney—despite directions of the Foreman—persisted upon the same grounds in refusing to answer the questions, stating: "Sir, I am sorry, but for the reasons I gave I still refuse to answer the question."

At the request of the Grand Jury, Judge McGohey held a hearing as to the propriety of the defendant's refusal to answer. At this hearing, defendant asserted that the answers might tend to incriminate him. The judge held that the witness had no privilege, and directed him to answer the questions before the Grand Jury. Before the Grand Jury, defendant refused to do so, again asserting his Fifth Amendment privilege. The judge held him in contempt for violation of 18 U.S.C. § 401(3), and sentenced him to a term of three months imprisonment. The defendant has appealed.

Delaney & Donoghue, New York City (Joseph Leary Delaney, New York City, of counsel), for defendant-appellant.

Paul W. Williams, U. S. Atty. for Southern Dist. of New York, New York City (Arthur H. Christy, Herbert M. Wachtell, Asst. U. S. Attys., New York City, Fioravante G. Perrotta, Asst. U. S. Atty., Lynbrook, N. Y., Charles H. Miller, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before CLARK, Chief Judge, and FRANK and LUMBARD, Circuit Judges.

FRANK, Circuit Judge.

██ 1. The government, in support of the judge's order, argues thus: Since defendant initially explained that he refused to answer because the answers would impair his business and harm other persons, his subsequent refusal, on Fifth Amendment grounds, was in bad faith and, on that account, should be disregarded. We do not agree. If he was clearly entitled to assert the privilege, his motives for doing so are immaterial. See Taft, J., in Ex parte Irvine, C.C., 74 F. 954, 964–965; cf. United States v. St. Pierre, 2 Cir., 128 F.2d 979, 980.

 2. The government also contends that defendant had waived his right to assert the privilege because he had previously testified he had paid the gratuities in question, and in some instances had testified as to the places where the payments were made. But in those answers he had not stated the amounts of the several payments. If answers to the further questions would reveal that he had made a gift to any one person of $600 or more, within any one year, he would have supplied leads to evidence on the basis of which he could be convicted under Sections 145(a) and 147 of the 1939 Internal Revenue Code, 26 U.S.C.A. §§ 145(a), 147, and Sections 6041(a) and 7203 of the 1954 Internal Revenue Code, 26 U.S.C.A. §§ 6041(a), 7203. See Hoffman v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 95 L.Ed. 1118.

On its facts, this case is not governed by Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344. For the same reason United States v. St. Pierre, 2 Cir., 132 F.2d 837, 147 A.L.R. 240, does not apply (even assuming that that decision still has vitality).[2] Moreover, since the decision in Rogers v. United States, supra, the Supreme Court has, in general, more generously interpreted the Fifth Amendment privilege. See, e.g., Emspak v. United States, 349 U.S. 190, 75 S.Ct.

2. The Supreme Court granted certiorari in that case; 318 U.S. 751, 63 S.Ct. 769, 87 L.Ed. 1126. Later, because the defendant had served his term, the Court dismissed the appeal as moot; 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199. Subsequently, in Rogers v. United States, 340 U.S. 367, 375, note 19, 71 S.Ct. 438, 443, the Court said: "United States v. St. Pierre, 2 Cir., 1942, 132 F.2d 837, 147 A.L.R. 240, presented a closer question since the 'detail' which St. Pierre was required to divulge would identify a person without whose testimony St. Pierre could not have been convicted of a crime. We, of course, do not here pass upon the precise factual question there decided by the Court of Appeals."

687, 99 L.Ed. 997, and Trock v. United States, 351 U.S. 976, 76 S.Ct. 1048, reversing United States v. Trock, 2 Cir., 232 F.2d 839, on the authority of Hoffman v. United States, supra.

As we think the defendant was within his constitutional rights in refusing to answer, he was not guilty of contempt.[3]

Reversed.

LUMBARD, Circuit Judge (dissenting).

Although the Fifth Amendment does indeed "express the high value our democracy puts on the individual's right of privacy," United States v. Gordon, 2 Cir., 236 F.2d 916, 920 it must also be remembered that "The result of using this, like any other privilege, is to deprive people of evidence which would be otherwise available; at best a disastrous necessity * * *." L. Hand, J., in United States v. St. Pierre, 2 Cir., 1942, 132 F.2d 837, 840, 147 A.L.R. 240. To avoid abuse of the privilege, the Supreme Court has repeatedly said that the privilege can only be claimed where the witness has "reasonable cause to apprehend danger," Hoffman v. United States, 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, and not where there is only a "'mere imaginary possibility'" of prosecution, as in this case. Mason v. United States, 1917, 244 U.S. 362, 366, 37 S.Ct. 621, 622, 61 L.Ed. 1198. Prior cases allowing the privilege will be searched in vain, for a set of facts which indicate less cause for reasonable apprehension than this record provides.

Prior to June 26, 1956, Courtney had appeared on four occasions before the grand jury impaneled to investigate allegations of racketeering in the garment and trucking industries. Apparently sometime after his first appearance and testimony on April 10, and prior to his second questioning on May 3, he retained counsel who attended outside the grand jury room and consulted frequently with Courtney during recesses in the

questioning, which recesses were freely granted for that purpose.

Prior to June 26 Courtney had turned over to the grand jury all the books and records of the Courtney Trucking Company of which he was a partner. Following this he was questioned about the disbursement of large sums of cash, unsupported by vouchers, which averaged from $15,000 to $20,000 a year. On June 26 he testified that just the week before he visited about ten packing houses where he had given money to various people. He gave the names of five of the houses which he had visited—National Packing, Fast Service, Payco, Gem and Interstate. Asked to give the names of those to whom he had given money, he refused to answer on the ground that it affected his business, and that it would impair his business. He asked to make a statement and testified thus:

"The Witness: My point is that the lifeblood of my business exists merely with the fact that when we go to a packing house or to a pier when we give a special gratuity or we can get our men in and out faster we will—

"The Foreman: We know that.

"The Witness: The reason why I will not say who receives the money; in the first place, there is no one who receives the money that will admit it, and in the second place, if we do tell the man who receives it the man will lose his job."

Courtney then left the grand jury room and consulted with his attorney and upon returning he persisted in his refusal to answer the questions "for the reasons I gave." He did further testify that he had paid "approximately $35, $40 in the buildings" although he refused to say how much or whom he had paid at any particular place. The witness stated to the grand jury that he had told his attorney that he was going to refuse to answer and the reasons therefor, and the attorney agreed that he re-

3. This opinion should be read together with our opinion in United States v. Gordon, 2 Cir., 236 F.2d 916.

fuse to answer. Up to this point there was no suggestion of possible incrimination. It was only thereafter at the hearing before Judge McGohey that Courtney's counsel argued that answers should not be compelled because the testimony might tend to incriminate him. Although the attorney had represented Courtney for at least seven weeks he could name no statute under which Courtney might be incriminated but said merely "There are at least some acts under interstate commerce which might make and tend to make it a crime to pay any moneys or gratuities or anything else in the course of his business." Of course this is not so. While the acceptance of shake-down money is a crime under 18 U.S.C.A. § 1951, commonly known as the Anti-Racketeering Law, the payment of the money is not. It took legal research after the event to discover provisions of the Internal Revenue Code of 1939, §§ 145(a) and 147, 26 U.S.C.A. §§ 145 (a), 147, and of the Internal Revenue Code of 1954, §§ 6041(a) and 7203, 26 U.S.C.A. §§ 6041(a), 7203, under which conceivably Courtney could be prosecuted if he had given to one person $600 or more in any one year and had not filed the required information returns concerning such payments.

If this record indicates anything, it is that Courtney neither feared prosecution under this minor tax code provision nor had "reasonable cause to apprehend danger" of such a prosecution. He certainly was unaware of the provision at the time of the refusal, and the privilege was ultimately invoked only as an afterthought. As the Supreme Court said in a situation similar in this respect: "Petitioner's claim of the privilege against self-incrimination was pure afterthought. Although the claim was made at the time of her second refusal to answer in the presence of the court, it came only after she had voluntarily testified to her status as an officer of the Communist Party * *. To uphold a claim of privilege in this case would open the way to distortion

of facts by permitting a witness to select any stopping place in the testimony." Rogers v. United States, 1951, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344. Here Courtney's election to stop at the point of giving the details as to the recipients of the money deprived the grand jury of the necessary means of testing the truth of his testimony. Was Courtney attempting to shield those who had shaken him down, or did he really distribute the money as he claimed? Such a claim of the privilege should induce us to question its good faith, not because a bad motive can make a clearly valid claim invalid, but because such a motive casts doubt on the incriminatory nature of the question. Ex parte Irvine, C.C.S.D. Ohio 1896, 74 F. 954, 964–965. When the privilege is claimed, the judge seldom if ever has very much evidence before him in support of the claim, for ordinarily only the witness knows enough of the facts and he of course should not be compelled to reveal them. The decisions, however, indicate that we are to examine the background and record for such support, see Hoffman v. United States, 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118, and where this is meager as here, the motive for the privilege is one of the few indicia of the reasonableness of the claim. In this case, it seems highly unlikely that the witness "had reasonable cause to apprehend danger" of prosecution for an offense which never occurred to him, and appeared for the first time on the argument on appeal. Everything points to the conclusion that the witness seized upon the privilege as an insubstantial excuse for silence after realizing the untenability of his real reasons, and that he did not honestly fear incrimination.

Moreover, the setting of this case as revealed in the record, involves nothing which would even remotely indicate the possibility of a prosecution for violation of this minor tax code provision. Here, the Grand Jury and the United States Attorney were not even remotely con-

cerned with petty violations of the tax laws. It is inconceivable that they would prosecute a legitimate businessman like Courtney who, if anything, was a victim of the offenses they were investigating, and whose cooperation they sought. In short Courtney was needed as a witness, not as a defendant. Courtney's attorney was aware of this. On the oral argument before Judge McGohey, when he sought to introduce evidence of incrimination, the few specific references he made were only to matters which the Grand Jury did have under investigation.[1] The few figures in the record regarding the amount of money distributed make it very doubtful that he distributed as much as $600 to any one person. He reported leaving $35–40 in ten places, in some of which there was more than one recipient. Even in the unlikely event that he distributed as much as $10 to any one person this would still be less than $600 for any one individual in the course of a year. On this record, even the loose test set forth in United States v. Coffey, 3 Cir., 1952, 198 F.2d 438, 440 is not complied with for even if we can imagine that it could be "shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States"[2] certainly this "suggested course and scheme of linkage" does "seem incredible in the circumstances of the particular case."[3]

In weighing the validity of a claim of the Fifth Amendment's protection, we ought to be guided by realities and those things which may reasonably happen, and not by the purely theoretical and fantastical. We are not to let the witness himself be the judge of whether answers would tend to incriminate him. Prosecution of Courtney because of his paying money to anyone was highly unlikely as a practical and common sense matter and never even occurred to Courtney himself during the weeks of his giving testimony. Courtney's only concern was how to avoid having to face embarrassment and possible business losses, perhaps even retaliation and violence. But these are not considerations which can excuse a witness from answering questions. This case would seem to go beyond any decided cases, for in every other case the record has contained evidence which would tie the witness to some crime which could reasonably be expected to be the subject of prosecution. If our courts are going to say to witnesses that they may be excused from testifying if a lawyer can find some statute which they might possibly have violated, then grand jury investigations will be severely and unnecessarily hindered. Every time a witness finds it expedient to keep silent, he need only claim the Amendment and if on appeal he can find a crime which includes some activity which may conceivably be revealed in some part by his answer to the question, he will succeed. We must indeed rely to some extent on the witness' claim alone, since forcing him to divulge the full grounds may defeat a valid claim of the privilege. But if a claim is made as a mere afterthought, when another very understandable but legally untenable reason is given first, we must ask for more than the witness' say-so and the admission of some apparently innocuous act. Compare Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198. The record before us contains nothing more. If prosecution is not a "remote possibility" in this case, it is hard to see where it would be.

Wisely construed the Fifth Amendment serves a necessary and beneficent purpose in protecting a free people from undue encroachment of a powerful government. But in recent years, as Judge Frank points out in United States v. Gordon, supra, many have questioned

---

1. He referred to prosecutor's statements, and the scope of inquiry of the Grand Jury. Appellant's Appendix 39–40.

2. The Coffey case test actually seems to require that "*the trial court* be shown"

and this certainly was not done. (Emphasis added.)

3. Cf. Heike v. United States, 1913, 227 U.S. 131, 142–143, 33 S.Ct. 226, 57 L. Ed. 450.

whether on balance it really serves the public interest. If the legitimate businessman is to be permitted the excuse of the Amendment from performing his duty to tell the truth we are giving the enemies of the Amendment a powerful argument for its curtailment.

I would affirm.