[Civ. No. 24035.   Second Dist., Div. One.   Aug. 13, 1959.]

MICKEY COHEN, Petitioner, v. SUPERIOR COURT
OF LOS ANGELES COUNTY, Respondent.

Cornell Ridley for Petitioner.

Harold W. Kennedy, County Counsel, William E. Lamoreaux, Assistant County Counsel, and Edward A. Nugent, Deputy County Counsel, for Respondent.

FOURT, J.—Petitioner in his brief has set forth that one Arthur Black brought an action against Mickey Cohen in tort ''for an alleged assault and battery asking for punitive and exemplary damages.'' At the trial of said action on July 22, 1959, the petitioner, Mickey Cohen, was called as a witness for the plaintiff under section 2055, Code of Civil Procedure. Without going into any matters which would disclose whether there was any merit to the action so far as the witness was concerned, counsel for the plaintiff started to question petitioner with reference to the wealth and mode of living of the petitioner which, if the case involved exemplary damages, was probably relevant.

The minutes of the clerk for July 22 set forth among other things that counsel ''stipulate as to the reputation of defendant'' and thereafter the following:

''Arthur Strock, counsel for plaintiff, asked the defendant the following question:

'' 'You came here in an automobile, didn't you, Mr. Cohen?'

''WITNESS: 'I refuse to answer on the ground that it may tend to incriminate me.'

''After considerable discussion between counsel and the court and conference by defendant's counsel with his client out of the presence of the court but while court was in session, the defendant's counsel made the following statement:

'' 'May we withdraw the objection?'

''WITNESS: 'Did I come here in an automobile?'

''MR. STROCK: 'Yes.'

''WITNESS: 'Yes.'

''MR. STROCK: 'Was it your automobile?'

''WITNESS: 'No.'

''MR. STROCK: 'What kind of an automobile was it?'

''WITNESS: 'A Cadillac.'

''MR. STROCK: 'As a matter of fact, it is an Eldorado, a brougham, that costs around $14,000.00—is that right?'

''WITNESS: 'That is right.'

''MR. STROCK: 'What kind of a model Cadillac was it?'

''WITNESS: 'It's an Eldorado, a convertible, not a brougham at all.'

"Mr. Strock: 'Who owns it?'

"Mr. Ridley, defendant's counsel, then stated: 'Just a minute.'

"The Court then stated: 'Counsel, you can feel free if you want to consult with your client away from me—feel free to talk to him if you want to.'

"After this conference the Witness then stated: 'I refuse to answer on the ground that it may tend to incriminate me.'

"The Court then told the witness that either he must answer the question or the Court would place him in contempt of court for failure to answer.

"Thereupon, defendant's counsel stated verbally his contentions as to why he had advised the witness to refrain from answering the question.

"Thereupon, defendant's counsel stated to the Court, in substance, that in his opinion the answering of said question would tend to incriminate the defendant and subject him to federal prosecution for possible federal tax evasion and that he was advising the witness to refrain from answering the above question.

"The Court then stated: 'I will stand by my ruling.'

"Thereafter, Mr. Ridley, counsel for defendant, asked for a 5-minute recess in which possible questions could be discussed either by himself with plaintiff's counsel or by Mr. Ridley with his client.

"Upon court reconvening, Mr. Ridley stated in substance that not only is there an investigation by the Federal Bureau of Internal Revenue against the defendant but that he had also received notice that he is on call to Washington for another investigation.

"The Court then stated: 'Now is this with respect to alleged income tax evasion?'

"Mr. Ridley: 'No, Your Honor, I think that is before the McClellan Committee there, to the best of my knowledge.'

"Mr. Ridley then continued: 'The third one is the one that is being carried on at the state level by the State Senate Crime Committee, and there is currently an action pending, I believe, in Division 28; is that right, Mr. Cohen?'

"Thereafter, among other things, the following took place: Counsel for plaintiff propounded a series of questions to the witness, which are hereinafter enumerated, and to these questions the defendant stated that he refused to answer on the advice of counsel and because the same would incriminate him and violate his federal constitutional rights. (These

questions that the defendant refused to answer were propounded after the witness had stated where he lived and had given the address of the house) :

"MR. STROCK: 'Do you own that house, or rent it, or is it loaned to you?'

"MR. RIDLEY: 'I think he would refuse to answer that.'

"MR. STROCK: 'And if he were to answer that he rented I would ask how much rent he paid, to which there would have been an objection.'

"THE COURT: 'Would there be an objection?'

"MR. RIDLEY: 'There would be an objection.'

"MR. STROCK: 'Then I would ask him if that included furniture, or was unfurnished.'

"MR. RIDLEY: 'There would be an objection.'

"MR. STROCK: 'Then I would ask him if he employed any servant or servants and whether part-time or full-time and how much he paid them.'

"MR. RIDLEY: 'There would be an objection to that.'

"MR. STROCK: 'I would ask him what restaurant he attended during this particular month.'

"MR. STROCK: 'I would ask him what the extent of his travels were during the past year and where he stayed?'

"MR. RIDLEY: 'There would be an objection to that.'

"MR. STROCK: '. . . and airplane lines and whether he went tourist or deluxe flight.'

"MR. RIDLEY: 'There would be an objection to that.'

"MR. RIDLEY: 'If Your Honor please, this is the very point at issue.'

"The Court then stated in part as follows: 'I understand that you are advising him—correct me if I am misstating you—to refuse to answer any of the questions underscored in red (these are the questions above set forth) that have just been propounded by plaintiff's counsel on the ground that answers thereto, or any of them, would tend to jeopardize and incriminate the witness from a constitutional standpoint, is that correct?'

"Thereafter, among other things, the defendant's counsel stated: 'I would like to say that would be the basis on which he would be answering, even though—and I want to insist he take my advice and not answer prior to the time because I feel he doesn't have, and I have got to take any responsibility.'

"THE COURT: 'Are you ready for a ruling on that matter, Mr. Ridley?'

"MR. RIDLEY: 'Yes, Your Honor.'

"The Court then stated to the witness: 'I instruct the witness to answer the questions, and each of them, now. Are you refusing to answer the questions, and each of them, Mr. Cohen, on the advice of your counsel?'

"Mr. Ridley: 'Yes, I am advising him to refuse to answer those questions on the ground that they may tend to incriminate him.'

"The Court: 'Will you advise me you won't answer the questions, Mr. Cohen, so we can get it in the transcript?'

"Witness: 'Well, I don't like to say to Your Honor that I won't.'

"The Court: 'I am not asking you that.'

"Witness: 'I don't say I don't want to answer them, I refuse to answer them on advice of my attorney.'

"The Court: 'I find the defendant in contempt of court for failing to answer the questions, or any of them, and impose a sentence of five days in the County Jail.' "

The order of commitment to the county jail for contempt of court is substantially the same as the minute entry.

The California Constitution of 1849, section 8 of article I provided in part: "No person shall . . . be compelled, in any criminal case, to be a witness against himself. . . ." In the Constitution of 1879 the clause was renumbered as article I, section 13.

In 1872 the Legislature adopted section 2065, Code of Civil Procedure, which reads in part as follows: "A witness must answer questions legal and pertinent to the matter in issue . . . but he need not give an answer which will have a tendency to subject him to punishment for a felony. . . ." The Fifth Amendment to the Constitution of the United States provides in part: "No person shall be . . . compelled in any criminal case to be a witness against himself. . . ."

The main question involved is how far shall the privilege against self incrimination be extended. We are of the belief that under all of the circumstances of this case the trial court erred and the petitioner should be discharged.

It must be noted at the outset that none of the pleadings of the case which was on trial are before us. There is no reporter's transcript of what was said by the parties and the judge other than that which is heretofore set forth as the minutes of the clerk and the commitment by the judge.

The Fifth Amendment to the United States Constitution is not applicable to the proceedings here, this being entirely a state proceeding (see *Twining* v. *New Jersey* (1908), 211

U.S. 78 [29 S.Ct. 14, 53 L.Ed. 97]). However, the interpretation placed upon the language of the Fifth Amendment by the federal courts is and should be very persuasive as to what interpretation we place upon the language of our state law which is in effect substantially the same as the Fifth Amendment.

Also, it must be remembered that testimony which might incriminate under the federal law would not necessarily incriminate under the state law; indeed it has happened that a state would not treat as privileged, testimony which would incriminate under the federal law. (See *State* v. *Arnold* (Ohio), 124 N.E.2d 473. *Application of Herlands*, 204 Misc. 373 [124 N.Y.S.2d 402].)

The record before us, excepting for the one sentence in the petitioner's brief, fails to disclose anything with reference to the nature of the action which was being tried by the court. If in fact the action was a tort action for assault and battery, and exemplary damages were being sought then very probably the wealth of the defendant was relevant and inquiry could ordinarily be made. If the action was a usual tort action and exemplary damages were not being sought then the questions obviously were not pertinent. There is nothing in the order of the judge in this case to indicate how or in what fashion any of the answers to any of the questions would have proved or disproved any issue in the case. There is no recital in the order of contempt that the questions and the answers thereto were pertinent to whatever issue was then before the court. Further, there is nothing in the order to the effect that if the witness answered the questions, his answers would not tend to incriminate him. (See *In re Rogers*, 129 Cal. 468 [62 P. 47].)

█ In *Overend* v. *Superior Court*, 131 Cal. 280, at 285-286 [63 P. 372], it was said:

"Again in *Batchelder* v. *Moore*, 42 Cal. 415, the court said: 'The power of a court to punish for alleged contempt of its authority, though undoubted, is in its nature arbitrary, and its exercise is not to be upheld, except under the circumstances and in the manner prescribed by law. █ It is essential to the validity of proceedings in contempt subjecting a party to fine and imprisonment that they show a case in point of jurisdiction within the provisions of the law by which such proceedings are authorized, for mere presumptions and intendments are not to be indulged in their support.' In *Ex parte Zeehandelaar, supra*, [71 Cal. 238 (12 P. 259)],

Justice Sharpstein said: 'In order to show a legal cause for the imprisonment of the petitioner, the return in this case should show that the question which he refused to answer was pertinent to the matter in issue before the court, and, as this is not shown by the return, no legal cause for the imprisonment of the petitioner is shown, and he should be discharged.' This conclusion of the justice, in substance was indorsed by the other members of the court. In *Schwarz* v. *Superior Court,* 111 Cal. 112 [43 P. 580], we find this declaration: 'The offense being criminal in its nature, both the charge and the finding and judgment of the court thereon are to be strictly construed in favor of the accused.' "

█ In this state, as in every other state so far as we can find, the witness is not the final judge of his right to exercise the privilege. The court must determine whether the answer might incriminate the witness (*Ex parte Stice,* 70 Cal. 51 [11 P. 459] ; *In re Rogers,* 129 Cal. 468 [62 P. 47] ; *Overend* v. *Superior Court,* 131 Cal. 280 [63 P. 372] ; *In re Berman,* 105 Cal.App. 37 [287 P. 125].)

█ Since the case of *Counselman* v. *Hitchcock,* 142 U.S. 547 [12 S.Ct. 195, 35 L.Ed. 1110], the federal courts have held that a witness is privileged not to answer what appears to be a harmless question if the answer to that question would provide either a "link in a chain of evidence" tending to prove the commission of a crime, or a clue which would enable the prosecutors to discover incriminating evidence. (*Blau* v. *United States,* 340 U.S. 159 [71 S.Ct. 223, 95 L.Ed. 170] ; see 5 Syracuse L. Rev. 127 for an article on *The Problem of the Apparently Innocuous Question.*) █ In this case the petitioner has the burden of showing that the testimony which was being required might be used in a prosecution to help establish his guilt. The privilege is not however limited to an answer which would directly incriminate the witness. As said in *United States* v. *Weisman,* 111 F.2d 260, 262, "A witness would, for example, be privileged from answering whether he left his home with a burglar's jimmy in his pocket, though that is not part of the crime of burglary."

█ The witness does not have to demonstrate conclusively that the answers to the questions will make him subject to prosecution nor need he demonstrate that he likely would be convicted.

. █ In this case there is no question, so far as the record before us discloses, but that the petitioner was "on call" to testify as a witness before the United States Senate (McClel-

lan) Labor-Management Rackets Committee; he was under investigation by the internal revenue service; he stated that the State Senate Crime Committee had investigated him (undoubtedly he was in error as to the name of the committee and he probably meant the Assembly Judiciary Sub-Committee on Rackets which met in Los Angeles and called petitioner before it to testify) ; he was involved in a criminal proceeding in Division 28 or some other division of the municipal court arising out of his failure to testify before the committee of the state Legislature. To say the least, several governmental agencies and legislative committees have shown a particular interest in what he does and where he does it. It is indicated that he is under suspicion of having participated in at least one or more crimes. Paraphrasing what was said in *United States* v. *Cusson*, 132 F.2d 413, the chase is one with a "warm enough scent" to make the "pursuit genuinely perilous" to the petitioner. The very fact that he was called as a witness in the state legislative committee hearing and that he is now being prosecuted in the municipal court is some evidence that he was or is a suspect.

The case of *Hoffman* v. *United States*, 341 U.S. 479 [71 S.Ct. 814, 95 L.Ed. 1118] appears to be the most recent case of the United States Supreme Court dealing with the problem at hand. In that particular case, Hoffman was called to testify before a grand jury which was investigating a number of federal offenses and he refused under a claim of privilege of self incrimination to answer questions as to his business, as to his last meeting and conversations with and whereabouts of a fugitive witness. He was adjudged in contempt upon the ground that there was no real danger of incrimination. He had at various times been publicly labeled as a racketeer and a gangster, he had a police record including a sentence on a narcotic charge. The Supreme Court reversed the lower court and in determining the cause stated among other things after referring to the Fifth Amendment, the following:

". . . This guarantee against testimonial compulsion, like other provisions of the Bill of Rights, 'was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed.' *Feldman* v. *United States*, 322 U.S. 487, 489 [88 L.Ed. 1408, 1412, 64 S.Ct. 1082, 154 A.L.R. 982] (1944). This provision of the Amendment must be accorded liberal construction in favor of the right

it was intended to secure. *Counselman* v. *Hitchcock,* 142 U.S. 547, 562 [35 L.Ed. 1110, 1113, 12 S.Ct. 195] (1892); *Arndstein* v. *McCarthy,* 254 U.S. 71, 72, 73 [65 L.Ed. 138, 141, 142, 41 S.Ct. 26] (1920).

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Patricia) *Blau* v. *United States,* 340 U.S. 149, *ante,* 170, 71 S.Ct. 223 (1950). . . . The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers* v. *United States,* 340 U.S. 367, *ante,* 344, 71 S.Ct. 438, 19 A.L.R.2d 378 (1951), and to require him to answer if 'it clearly appears to the court that he is mistaken.' *Temple* v. *Commonwealth,* 75 Va. 892, 899 (1881). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in *Ex parte Irvine,* 74 F. 954, 960 (C.C.S.D. Ohio 1896). . . .

"The court should have considered, in connection with the business questions, that the chief occupation of some persons involves evasion of federal criminal laws, and that truthful answers by petitioner to these questions might have disclosed that he was engaged in such proscribed activity.

" . . . . . . . . . . . . . .

". . . Petitioner could reasonably have sensed the peril of prosecution for federal offenses ranging from obstruction to conspiracy.

"In this setting it was not 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency' to incriminate. *Temple* v. *Common-*

*wealth,* 75 Va. 892, 898 (1881), [cited with approval in *Overend* v. *Superior Court,* 131 Cal. 280 (63 P. 372)], cited with approval in *Counselman* v. *Hitchcock,* 142 U.S. 547, 579, 580 [35 L.Ed. 1110, 1119, 1120, 12 S.Ct. 195] (1892). See also *Arndstein* v. *McCarthy,* 254 U.S. 71 [65 L.Ed. 138, 41 S.Ct. 26] (1920).

". . . . . . . . . . . .

". . . If this result adds to the burden of diligence and efficiency resting on enforcement authorities, any other conclusion would seriously compromise an important constitutional liberty. 'The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime.' "

█ The court in the present case should have construed the questions addressed to the witness in the light of the setting in which the questions were asked. (See *United States* v. *Fischetti,* 103 F.Supp. 796). Further the court should "be governed as much by the personal perceptions of the peculiarities of the case as by the facts actually in evidence." (*Kiewel* v. *United States,* 204 F.2d 1.) █ Our attention is directed to the fact that the name of Mickey Cohen has been prominently and unfavorably referred to over a long period of time and that prior to his appearance in court on July 22 and 24 he has been identified on various occasions as being associated with various "crime syndicates" and with "gang" membership, and that the press repeatedly has referred to him as an ex-convict, racketeer and gangster. It takes no imagination to come to the conclusion from the foregoing that the petitioner either presently or in the past has been engaged in a large and varied scale of criminal activities and has been in association with well-known figures in questionable "business operations." Or as put in *United States* v. *Girgenti,* 197 F.2d 218, "it is character testimony in reverse" or that the bad record of the witness is some evidence that whatever he happened to be doing at the time was probably illegal. The formal record is not the exclusive criterion. (*United States* v. *Singleton,* 193 F.2d 466.)

See also *United States* v. *Coffey,* 198 F.2d 438, 440-441, where it is said: ". . . in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical; rather he must be acutely aware that in the deviousness of crime and its detection

incrimination may be approached and achieved by obscure and unlikely lines of inquiry.''

In this setting ''it was not *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) *cannot possibly* have such tendency.''

We must keep in mind that in this state it is a felony to conspire or agree to commit a misdemeanor (Pen. Code, § 182, subd. 1), and it might well have been that petitioner's lawyer told him of the dragnet characteristics of a conspiracy charge and trial.

The respondent court has cited the rule to the effect that if any one of the questions is good then the contempt order is good. Even if it is assumed that one of the questions was good we think there is little merit to the argument for the reason that to take any single question and to treat it as if it stood alone is to ''artificialize the actualities.'' (*United States* v. *Gordon*, 236 F.2d 916-920.)

We are not unmindful of the fact that to hold as we do in this case may impede the enforcement of some of the laws. That contention has been answered many times. It was appropriately said in *United States* v. *Gordon*, 236 F.2d 916, in part, as follows:

''. . . That provision unquestionably does sometimes impede enforcement of the criminal laws. But that was one of the clear purposes of the constitutional privilege, i.e., to prevent a court from compelling a witness—who might or not be a criminal—to give testimony which might incriminate him. All privileges not to testify have the same impeding effect. This fact was emphasized by Bentham, the first doughty foe of the anti-self-incrimination privilege. He depicted it as an absurd interference with the expeditious punishment of criminals. But, on the same grounds, he argued for the abandonment of the client-lawyer privilege. Yet few today want that privilege abandoned, although it enjoys no explicit constitutional protection.

''.   .   .   .   .   .   .   .   .   .   .   .

''American prosecutors must learn to adjust themselves to these obstacles. The purpose of the Bill of Rights was, as Madison declared, 'to oblige the government to control itself.' We are committed to the principle that any method of pursuing suspected criminals must give way when it clashes with these constitutional guarantees. The framers of the Constitutional Amendments thought those guarantees embodied an

even more important policy than that of detecting and punishing crime. Considered solely in terms of procedure, those constitutional safeguards seem logically indefensible. Considered, however, as conferring substantive rights, they assume a different significance: They express the high value our democracy puts on the individual's right of privacy. 'Traditionally, Anglo-American law values the individual's life and freedom so highly that the interest of the state in discovering and punishing wrongdoers is subordinated to the right of the accused to remain a passive spectator of the fact of his wrongdoing.' ''

And in *United States* v. *Girgenti*, 197 F.2d 218 (1952) : ''. . . If our conclusion permits, in the individual case, a rascal to go unwhipped or a villain unhung, it is because Americans have thought it better public policy to lose a conviction now and then than to force a conviction from the defendant's own mouth.''

And in *United States* v. *Fischcetti*, 103 F.Supp. 796 : ''The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime. While the privilege is subject to abuse and misuse, it is firmly embedded in our constitutional and legal frameworks as a bulwark against iniquitous methods of prosecution. It protects the individual from any disclosure, in the form of oral testimony, documents or chattels, sought by legal process against him as a witness.''

This court issued an order to show cause why a writ of prohibition should not issue restraining respondent court from enforcing a prison sentence upon petitioner for contempt of court in refusing to answer certain questions propounded to him in a civil action pending in said court, on the ground that his answers would tend to incriminate him.

Let a peremptory writ of prohibition issue restraining respondent court from enforcing its judgment ordering petitioner committed to the county jail for five days for contempt of said court, and that the order adjudging petitioner in contempt be, and the same is hereby annulled.

White, P. J., and Lillie, J., concurred.