## UNITED STATES v. DOTO.

United States District Court
S. D. New York.
Feb. 13, 1953.

advice of competent counsel of his choice, he waived trial by jury. It was agreed that the defendant was properly subpoenaed and that the stenographic record of his examination was accurate. No question was raised as to the legality of the Committee, its organization, or the relevancy of the questions to the scope of the inquiry. The sole issue presented is whether the defendant properly asserted a claim of privilege against self-incrimination in response to each of sixteen questions asked by the Committee at a public hearing in the City of New York on March 12, 1951.

At the start of his examination that day the defendant, having received permission to do so, made the following statement:

"When I was previously before this committee in Washington, I stated the reasons why I felt it necessary to avail myself of my constitutional privilege to refuse to answer questions. I stated at that time that members of this committee and other members of the Federal Government had been publicly proclaiming that I was a member of a nationally organized crime syndicate and were seeking to link me up with charges of organized crime in and between various States, as well as crimes under Federal income tax laws, anti-rackcteering laws and other Federal laws.

"Since my previous appearance, the press has carried a release by this committee, alleging that I am a member of a crime syndicate operating throughout the East and acting in conjunction with another crime syndicate in Chicago. The release also asserted that one Luciano sits in Italy as arbitrator of all disputes among the various crime syndicates. It is further said that I am a member of an organization known as the Mafia which controls crime on an interstate and national basis.

"This committee has also suggested and implied that efforts have been made by me to get into certain legitimate businesses and to use racketeering methods therein, in order to expand the businesses, to prevent competition, and to use such businesses as an aid in con-

Myles J. Lane, U. S. Atty., Robert Martin, Asst. U. S. Atty., New York City, for plaintiff.

Corbin, Bennett & Delehanty, New York City, Harold H. Corbin and Edward J. Bennett, New York City, for defendant.

McGOHEY, District Judge.

The defendant was indicted for sixteen contempts of the United States Senate Special Committee To Investigate Organized Crime in Interstate Commerce. With the

cealing and covering up income-tax frauds.

"All of these statements and suggestions by the committee emphasize the fact that its sole purpose in calling me before it, is to try to obtain evidence to be used against me in criminal prosecutions. Indeed, certain local prosecutions have already been instigated against me in various States. There is no doubt in my mind that the committee wishes to instigate and support all possible additional prosecutions against me both of a State and a Federal nature.

"For these reasons, I see no reason to change my previous position, which is that I should not testify against myself in any respect." (p. 3, Senate Report No. 201.)

The defendant had appeared before the Committee in Washington on December 12, 1950, and there made a statement setting forth similar grounds in support of a claim of privilege as to 131 questions about matters substantially the same as those covered by the questions asked him in New York. Shortly thereafter, on January 23, 1951, the Senate cited him for contempt.[1] On February 28, 1951, the Committee issued a "Second Interim Report." [2] Its first, which had been issued on August 18, 1951,[3] stated that the Committee concluded from its investigation up till then that "There is substantial and strongly convincing evidence that organized groups of criminals have been engaged in many parts of the Nation in illegal activities, utilizing the channels of interstate commerce, and often operating throughout many States." The report further stated that it appeared that these groups' operations followed "a common pattern;" and that while it was not yet clear whether they were "knit into one or more Nation-wide syndicates * * *," it was clear "that there are several strong and powerful organizations with lines of inter-

relationship and cooperation between them which makes it feasible for them at least occasionally to combine their activities." These conclusions were based in part on testimony, taken in Florida, on the basis of which the Committee asserted that the defendant was one of the "gangsters and racketeers" from New York and other cities who "consorted" and "operated" gambling enterprises at specified hotels and clubs in that State. Net profits of about $350,000 in 1948 and $600,000 in 1949 were said to have been realized from these enterprises of the defendant and his associates, one of whom was said to be Meyer Lansky.

The "Second Interim Report" was issued twelve days before the defendant was called for examination in New York. It reviewed the Committee's work up to date, from the minutes of its hearings in fourteen cities across the nation at which a total of 500 witnesses had testified. The report stated that this testimony made clear that crime was organized in the United States; that it was financed from the profits of organized gambling and maintained by organized violence under political protection secured by the corruption of public officials; that there was interstate relationship and regular contact and liaison between leading gangs; that this defendant was "the outstanding underworld leader in New York City;" that there were two crime syndicates, one "with an axis between New York and Miami headed by Frank Costello and Joe Adonis," this defendant, and one with "an axis between Miami and the Capone Syndicate" (Chicago); that "the adhesive between the major crime syndicates" is the Mafia which is described as a nation-wide crime syndicate "under centralized direction and control;" that the "Federal Government is being defrauded of many millions of dollars, perhaps running into hundreds of millions, of tax revenues by the mobsters engaged in organized criminal activities." The report further stated that

---

1. In September, 1952, a Grand Jury in the District of Columbia indicted the defendant for ten contempts of the Committee alleged to have been committed at the December 12, 1950 hearing. That indictment has not yet been tried.

2. Def. Ex. C.

3. Def. Ex. B.

"The vast profits from organized crime are being used to buy up legitimate businesses" and cited, as an example, the following:

"Joe Adonis [the defendant] is the principal stockholder of the Automotive Conveying Co. which hauls assembled Ford automobiles. * * *

"A gangster in a legitimate business does not suddenly become respectable. The methods which he uses to achieve success in racketeering and gambling enterprises are not sloughed off. Thus there is evidence in the testimony concerning the use of homicide, intimidation, and strong-arm violence to eliminate competition or to compel customers to take merchandise sold by the mobsters. Monopoly and unfair competitive methods are the keys to the big money in criminal activities. It is also sought by the mobsters when they enter legitimate business. In addition to attempting to secure monopolies, there is considerable evidence of their black-market practices, tax evasion and unjust enrichment from legitimate businesses. These practices add further to the tremendous economic and political power which is wielded by the forces of organized crime."

After the defendant made his statement set out above, he was advised that he could not claim privilege generally, but only in response to specific questions. The examination then began. In attendance at the time were representatives of the United States Attorney, the Internal Revenue Bureau, the Narcotics Bureau and other federal law enforcement agencies. The defendant was clearly "a person under investigation" as the Committee reports abundantly show, and he was so described in the testimony of the Committee's chief counsel at the trial. The defendant was asked a total of 295 questions, in response to nineteen of which he asserted his privilege.

The Senate cited him for contempt on March 30, 1951. On December 2, 1952, a Grand Jury in New York indicted him on sixteen counts. The questions were as follows:

Count 1. Now, Mr. Adonis, did you ever make a political contribution to any campaign, State, local or National?

Count 2. Would you mind specifying what crime or what connection it might have?

Count 3. You were once in business with McGoldrick, were you not?

Count 4. That was at the Piping Rock Casino in Saratoga, wasn't it?

Count 5. Did you ever, from time to time, give any of them money to help them in a primary fight?

Count 6. Well, aside from any discussions with Mr. Lipsky, are you able to state under oath that you never did give anybody any money to help in a primary fight?

Count 7. Have you disassociated yourself from the Automotive Conveyance Co.?

Count 8. What other legitimate occupations have you had in the last five years?

Count 9. Have you engaged in a business of producing television or selling television?

Count 10. Were you ever in a partnership in connection with a television business with Frank Costello?

Count 11. Or with Meyer Lansky?

Count 12. Or with any other persons?

Count 13. And he has some connection with this Automotive Conveyance Co.; does he not? (Charles Cherri.)

Count 14. Have you ever had anything to do with the policy racket in New York City?

Count 15. And the Lodi establishment, you are still unwilling to tell the Committee what you know about that?

Count 16. Mr. Adonis, were you ever a partner, or have any interest in the Piping Rock Casino at Saratoga?

The validity of the defendant's assertion of the privilege against self-incrimination depends on whether the circumstances described above, and the obvious implications of the questions, "could have sufficed to create a reasonable apprehension in the mind of the defendant that

his answers might be incriminating." [4] The claim of privilege should be sustained unless it is " * * * *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) *cannot possibly* have such tendency' to incriminate." [5]

Applying these tests, I think it is clear that the privilege was validly asserted as to all of the questions in Counts 2 through 16 but I think it was not validly asserted in response to the question in Count 1. The defendant was there asked if he had ever made "a political contribution to any campaign, State, local or National?" It is not a crime generally to make a political campaign contribution. The question called for no disclosure of amounts, names, parties, dates, or places; or whether the contributions were in money, services or otherwise. It is impossible, without assuming many additional facts, to see what incrimination could possibly result from answering this question.[6] It was suggested in argument and briefs that the witness could quite reasonably have feared that if he answered this question he might thereby waive his privilege as to subsequent questions about details of the contributions.[7] This argument is refuted by the transcript of the defendant's examination.[8] This shows that he had no hesitancy in answering general questions on certain matters, such as acquaintance or social relations with specified persons, as to which he later refused to give details. I think it is clear that he had no such fear as is suggested. Moreover, since an answer to the question could not constitute an admis-

sion or proof of any crime, he would be entitled to decline to answer subsequent questions about the subject if to do so might tend to incriminate him.[9] This case is thus distinguished from Rogers v. United States, supra. There, the witness had already incriminated herself, before she claimed privilege as to the questions which sought the names of her associates.

The question in Count 2 clearly justified the claim of privilege. If a witness could be compelled to specify the crime which he fears his answer would discover, the privilege would be useless.[10]

The remaining counts are based on questions which called for disclosures of business and financial dealings with various named persons and in some instances disclosures of ownership of gambling enterprises in various states. In the light of the Committee's statements about him and the testimony of other witnesses at earlier hearings, the implications of violations of federal income tax and other criminal statutes [11] in all these questions were I think quite sufficient "to create a reasonable apprehension in the mind of the defendant that his answers might be incriminating." [12] Certainly it is not "perfectly clear" that his answers "could not possibly" have a tendency to incriminate, as the Hoffman case requires. The defendant, by previously filing income tax returns which showed income from Automotive Conveyance, did not thereby waive his right to claim his privilege as to the questions (Counts 7 and 13) about his connections with that enterprise. The filing of the tax returns did not constitute proof or admission of any crime, and so he was entitled to decline to answer

4. United States v. Costello, 2 Cir., 1952, 198 F.2d 200, 202.

5. Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118.

6. See United States v. Weinberg, 2 Cir., 65 F.2d 394–395, certiorari denied, 290 U.S. 675, 54 S.Ct. 93, 78 L.Ed. 583.

7. See Rogers v. United States, 340 U.S. 367, 372–373, 71 S.Ct. 438, 95 L.Ed. 344.

8. Gov't Ex. 6, passim.

9. McCarthy v. Arndstein, 262 U.S. 355, 43

S.Ct. 562, 67 L.Ed. 1023; United States v. Costello, supra note 1.

10. See Hoffman v. United States, supra, 341 U.S. at page 486, 71 S.Ct. at page 818.

11. 18 U.S.C.A. §§ 1302, 1342 (Illegal use of mails); 18 U.S.C.A. §§ 371, 372 (Conspiracy to violate federal laws); 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence); 18 U.S.C.A. § 201 (Offer to officer of United States to influence his decision).

12. See United States v. Costello, supra.

these questions since he had, as I believe, a rational basis for apprehension that to do so might incriminate him.

Accordingly I find the defendant guilty on Count 1 and not guilty on the remaining counts, numbered 2 to 16, inclusive.