## PEOPLE *v.* ELLERHORST.

1. EVIDENCE—EXECUTIVE PRIVILEGE.

   The claim of executive privilege against giving testimony is not determinative of its existence, and court must decide whether circumstances are appropriate for the claim of privilege.

2. SAME—EXECUTIVE PRIVILEGE—NECESSITY TO MOVING PARTY.

   A court should examine the necessity to the moving party of the evidentiary material sought as bearing on how far the court should go in exploring the applicability of a claim of executive privilege against producing the material.

3. SAME—EXECUTIVE PRIVILEGE—TREASURY REGULATION.

   Trial court's holding that information from internal revenue investigator as to prior dealings with people's witness, co-conspirator of defendant in criminal prosecution, was privileged under treasury department regulations and that cross-examination should be limited to matters brought out under direct examination was not error where defendant conceded regulation to be valid, the inquiries, on their face, were within intent of privilege, and defendant's interest in the information was based on dubious showing of necessity since information was desired solely for purposes of impeaching the reliability of the witness co-conspirator by way of collateral matters (Treasury Department regulation 12, art 80).

4. SAME—EXECUTIVE PRIVILEGE—ADVANCE SUBMISSION OF QUESTIONS FOR APPROVAL.

   Trial court's ruling as to privileged nature of internal revenue investigator's prior dealings with witness, co-conspirator of defendant, based on desire to avoid delay in trial, did not amount to a prohibition against the advance submission of questions of possible authorization suggested by United States assistant attorney general in long trial.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 58 Am Jur, Witnesses § 533.
[3, 4] 58 Am Jur, Witnesses §§ 533, 536.
[5] 58 Am Jur, Witnesses §§ 674, 675, 783.

5. SAME — CROSS-EXAMINATION — IMPEACHMENT — COLLATERAL MAT-
    TERS.

    Defendant's questions to internal revenue investigator regarding
    prior dealings with witness, co-conspirator of defendant, were
    properly disallowed on grounds that testimony of others may
    not be produced to impeach a witness by putting in issue the
    accuracy or truthfulness of the witness on unrelated matters.

Appeal from Recorder's Court of Detroit, Brennan (Vincent J.), J. Submitted Division 3 February 9, 1968, at Detroit. (Docket No. 1,770.) Decided August 26, 1968.

Lester Ellerhorst was convicted on 2 counts of conspiracies to commit murder and extortion. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Thomas P. Smith,* Assistant Prosecuting Attorney, for the people.

*Louisell & Barris,* for defendant.

PETERSON, J. Appellant, with others, was charged in two counts with conspiracies to commit murder and extortion, with guilty verdicts returned on both counts. The proofs disclosed a bizarre plot, conceived by appellant, for the extortion of money from several people who were to be kidnapped, mistreated and finally murdered. In addition to his co-defendants, appellant enlisted the aid of Donald Sundberg and Floyd Kupkowski in furtherance of the plot, and it was upon their testimony that the prosecution's case rested.[1] The specific details of the con-

---

[1] Sundberg had testified at length at the preliminary examination. He claimed the privilege against self-incrimination at trial, and persisted therein although the trial judge ruled that he had waived

spiracy, as they related it, are unimportant, but it
may be noted that there was an abundance of cir-
cumstantial evidence tending to corroborate their
testimony. In view of the question raised by this
appeal, it might also be noted that the conspiracy
did not involve any questions of federal taxation or
administration of the Internal Revenue Service.

In addition to their testimony about their rela-
tionship with appellant and the details of the con-
spiracy, both Sundberg and Kupkowski testified to:
an effort to tip off authorities to the plot. Kup-
kowski testified that he tried to reach an FBI agent,
failing which he called Jeff Arn, a criminal inves-
tigator with the United States Internal Revenue
Service, who put him in contact with the Detroit
Police Department. He testified that he had had
previous contacts with Arn as an informer but that
he had never been paid for doing so.

Arn was called as a witness,[2] and his direct exami-
nation consisted of only a few questions. Other than
his name and occupation on May 20, 1965, the exami-
nation was as follows (some repetition omitted):

"*Q.* On that date did you receive a complaint from
a person by the name of Floyd Kupkowski?
"*A.* Yes, sir; I did.
"*Q.* And after receiving that complaint did you
notify any members of the Detroit Police Depart-
ment?
"*A.* Yes, sir, I did.
"*Q.* Do you recall whom you notified?
"*A.* I spoke with Inspector Dunleavy and other
officers.

*          *          *

the privilege. The trial judge held him in contempt, ruled that he
was not available and directed that his testimony at the preliminary
examination be read to the jury.
2 His name was indorsed on the information, but it is clear that this
was unnecessary since he was not a *res gestae* witness, and counsel
agreed that he was not a necessary witness.

"*Q.* Did you ever see the complainant personally?

\*          \*          \*

"*A.* I went out to see him with another person, yes, sir.

"*Q.* And who was the other person?

"*A.* Special Agent John Martell.

\*          \*          \*

"*Q.* All you know about this case was that you received a complaint and you relayed the information to members of the Detroit Police Department?

"*A.* Yes, sir, that is correct.

\*          \*          \*

*Cross-examination (by Mr. DeRyck)*

"*Q.* I believe you testified that you knew this man who called you and later came to see you, Floyd Kupkowski?

"*A.* I respectfully decline to answer that question on the grounds of Treasury Department regulation 12, article 80.[3]

---

[3] Art. 80. *Contents Not to Be Disclosed Without Permission.* All records in the offices or in charge of officers of internal revenue, responsible or subordinate, are in their custody and control for governmental purposes only. They have no control and no discretion with regard to the use of them for any other purpose: *Provided*, that Record 21, "Record of seizure and sale of real estate," maintained in offices of collectors of internal revenue, shall be open for public inspection in such offices, and a certified or uncertified copy of any such record covering particular property will be furnished by the collector upon application to him and payment of a fee of $1.

Except as otherwise provided in the preceding paragraph internal revenue officers are hereby prohibited from giving out any records, or any copies thereof, to private persons or to local officers, or to produce such records or copies thereof in a State court, whether in answer to subpoena *duces tecum* or otherwise, or to testify to facts coming to their knowledge in their official capacities without express authority from the Commissioner  \*  \*  \*  .

Whenever subpoenas shall have been served upon them they will, unless otherwise expressly directed, appear in court in answer thereto and respectfully decline to produce the records or give the testimony called for, on the ground of being prohibited therefrom by the regulations of the Treasury Department. Officers disobeying these instructions will be dismissed from the service and may incur criminal liability. [See section 3167, Revised Statutes (now codified as 18 USC § 1905 and 26 USC §§ 6103 and 7213[a] and [b])]. Treasury Regulations 12, art 80, as revised October 1, 1920 and amended Treasury Decision 4640, xv–1 Cum Bull 495 (1936) and Treasury Decision 5428, 1945 Cum Bull 462.

Appellant does not challenge the validity of such regulation but claims that the trial judge mishandled the questions arising because of the claim of privilege so as to effectually deny appellant the right of cross-examining the witness. It is claimed that the trial judge accepted the claim of privilege without passing upon the question of whether the privilege was applicable to the information sought, and that the court prohibited appellant from obtaining authorization from the Commissioner of Internal Revenue to go into other matters.

An Assistant Attorney General of the United States was present who read the treasury regulation to the court. He stated that the witness had been authorized to testify to the receipt of the complaint, identity of the source, the nature of the information received and the fact that the information had been communicated to the Detroit Police Department. He indicated further that it was not thought proper to permit a broad cross-examination probing any dealings that Kupkowski might have had with the Internal Revenue Service through Arn, but he advised court and counsel that if there were specific questions that counsel wished to put to the witness, he would "forthwith" get a determination as to whether they could be answered. After discussion between the court, counsel and the Assistant Attorney General as to the extent of the privilege, the matter was adjourned until the following morning to permit research on the point. The trial judge ruled that cross-examination should be limited to matters covered on direct examination, noting that Arn was not called because of personal knowledge of the facts but only to show the chain of complaint in which he was an intermediary.

It seems well established that the claim of executive privilege is not determinative of its existence. In *United States* v. *Reynolds* (1953), 345 US 1 (73

S Ct 528, 97 L Ed 727, 32 ALR2d 382), suit was brought under the Federal Tort Claims Act for a death occurring in the crash of a military aircraft. A discovery order under Federal Rule 34 pertaining to the aircraft records and data accumulated in investigating the crash was resisted by the government, but the Advocate General of the Air Force offered three surviving members of the plane crew for examination on all matters "except those of a classified nature." The trial court directed production of the documents for the purpose of determining if they were privileged[4] and the government again refused.

In examining the claim of privilege, the court said (pp 8–10):

"The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect. The latter requirement is the only one which presents real difficulty. As to it, we find it helpful to draw upon judicial experience in dealing with an analogous privilege, the privilege against self-incrimination.

"The privilege against self-incrimination presented the courts with a similar sort of problem. Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses. * * * The court must be satisfied from all the evidence and circumstances, and 'from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered

---

[4] *In camera* production for a preliminary ruling was approved at the Court of Appeals level of *Reynolds* (CA 3, 1951), 192 F2d 987, and in *Cresmer* v. *United States* (1949), 9 FRD 203. At least as to criminal trials, this was disapproved in *Jencks* v. *United States* (1957), 353 US 657 (77 S Ct 1007, 1 L Ed 2d 1103).

might be dangerous because injurious disclosure would result.' *Hoffman* v. *United States* (1951), 371 US 479, 486, 487 [71 S Ct 814, 95 L Ed 1118]. If the court is so satisfied, the claim of privilege will be accepted without requiring further disclosure.

"Regardless of how it is articulated, some like formula of compromise must be applied here. Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers. Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case."

In *Reynolds*, the court found that the circumstances indicated a "reasonable possibility" that privileged material was involved which, being opposed by no strong showing of necessity for access to the documents, warranted a finding of privilege. At p 11 the court said:

"In each case, the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. *A fortiori*, where necessity is dubious, a formal claim of privilege, made under circumstances of this case, will have to prevail. Here, necessity was greatly minimized by an available alternative, which might have given respondents the evidence to make out their case without forcing a showdown on the claim of privilege.[5] By their fail-

---

[5] Not the least of the policy factors to be considered is this indicated desirability of avoiding a direct confrontation between different divisions or units of government. This ought to be taken into account by counsel in preparation of proofs, and will be a factor that the court must consider at trial. There is another practical consideration:  such confrontations can only exacerbate the problem, often

ure to pursue that alternative, respondents have posed the privilege question for decision with the formal claim of privilege set against a dubious showing of necessity."

In dealing with the claims of governmental privilege, then, the courts must ask the same questions raised in examining other privilege claims, *i.e.*, is there a shoe?;[6] does it appear to fit?[7] As to the latter question, *Reynolds* is important not only in suggesting the need for caution in examining the claim of privilege so as not to defeat its purpose, but in noting that the necessity for obtaining the material sought will have a bearing on how far the court should go in exploring the applicability of the privilege.[8] Necessity in this sense involves not only the importance of the material to the outcome of the trial, but also the alternatives available to the litigant to obtain the necessary evidence.[9]

In the instant case, we do not think that the rulings of the trial judge can be viewed as an unquestioning acceptance of the privilege claim. The privilege was claimed under a regulation which appellant concedes to be valid. The inquiries proposed by appellant were designed to inquire into the previous relationship between Kupkowski and the

resulting in an absolute stalemate of the participants. (See *North Carolina* v. *Carr* (WD NC, 1967), 264 F Supp 75.

[6] No privilege found, see *Rosee* v. *Board of Trade of City of Chicago* (1964), 35 FRD 512.

[7] Privilege inapplicable, see *Morris* v. *Atchison T. & S. F. Ry. Co.* (1957), 21 FRD 155; *Mitchell* v. *Bass* (CA 8, 1958), 252 F2d 513. And see *NLRB* v. *Capitol Fish Company* (CA 5, 1961), 294 F2d 868.

[8] It would seem obvious that the kind of privilege involved would also have a bearing on the extent of the court's inquiry into the question of applicability. Not every governmental privilege has as vital a basis as the privilege of military security or against incrimination.

[9] One alternative is to attempt authorization for disclosure prior to trial. In *NLRB* v. *General Armature & Mfg. Co.* (CA 3, 1951), 192 F2d 316, failure to seek authorization was determinative. Here, Arn's name was endorsed on the information. Might not appellant thus have discovered the forthcoming privilege claim and sought an authorization of any pertinent matter prior to trial?

witness in his capacity as an officer governed by the regulation. The inquiries, on their face, were within the intent of the privilege. In opposition to the claim of privilege, appellant indicated no interest in the witness other than to explore his knowledge of Kupkowski's credibility. This, we believe, was such a dubious showing of necessity that the formal claim of privilege had to prevail, and the trial judge was not in error in limiting cross-examination to matters brought out on direct examination.[10]

Nor do we believe that the trial judge's rulings amounted to a prohibition against pursuing the offer of the Assistant Attorney General to submit proposed questions for possible authorization. It is clear that the trial judge did not wish to delay the trial by a piecemeal cross-examination of Arn in which each successive question would be submitted to the commissioner for approval. We do not think his ruling went any further than this. The trial was not a short one, and there is no reason apparent why counsel could not have followed the course suggested by the Assistant Attorney General.

Entirely apart from the claim of privilege, however, Arn would still not be heard to answer the questions to which objection was made. From the questions and from counsel's statement on a special record of what he proposed for cross-examination it is clear that appellant's counsel sought only information which would impeach the credibility of Kupkowski.

---

[10] It may well be that in a criminal prosecution where a privilege is found to exist involving evidence that is pertinent, the court should adjourn the trial until all possibility of waiving the privilege has been exhausted, but that is not the case at hand. *Parsons* v. *Alabama* (1948), 251 Ala 467 (38 So 2d 209). Neither are we called on to decide the case of the unwaived privilege involving testimony crucial to conviction or acquittal. See *United States* v. *Andolschek* (CA 2, 1944), 142 F2d 503, and *Jencks* v. *United States, supra.*

"*Q.* Did you express any judgment to Inspector Dunleavy based on your prior experiences with Kupkowski as to whether Kupkowski was a reliable person or an unreliable person?

*　　*　　*

"*Q.* In any of your conversations with the Detroit Police Department or representatives of the Detroit Police Department concerning this matter and in no way concerning taxes or Internal Revenue, did you ever express to any member of the Detroit Police *Department your assessment or appraisal of the* reliability of this man, Kupkowski? (Emphasis supplied.)

*　　*　　*

"*Mr. Louisell:* Kupkowski has testified to certain things in the course of this trial as to which I would believe, not having spoken with Mr. Arn, but solely on the basis of what Kupkowski has testified to here, I would believe that Mr. Arn would be possessed of information that might have materially affected or might materially affect the credibility of Kupkowski. Now you will recall the questions that were put to Kupkowski on the stand as to his being an informer for the FBI. As to whether or not the FBI—as to whether he was an informer for the Treasury Department, and his denial that he ever received any compensation for that.

*　　*　　*

"*Mr. Coury:* The defense is bound by the answers given to them by Mr. Kupkowski.

"*Mr. DeRyck:* What did you say?

"*Mr. Coury:* They are bound by the answers that Mr. Kupkowski gave them.

"*Mr. DeRyck:* Why?

"*Mr. Louisell:* You mean we can't prove he is a liar?"

The answer, of course, is that counsel may try, but only within acceptable evidentiary rules. On col-

lateral matters, the testimony of a witness is binding
except as it may be shaken by his own cross-examina-
tion, and even such cross-examination may be limited
in the discretion of the trial judge to keep the trial
within the bounds of relevancy and pertinency. Un-
der no circumstances may testimony of others be
produced to impeach by putting in issue the ac-
curacy or truthfulness of the witness on unrelated
matters. Thus in *People* v. *Williams* (1910), 159
Mich 518, 521:

"When the prosecuting attorney asked the re-
spondent what conversation he had with the officer
with reference to the collateral matter of a com-
plaint against Boyd and Wilson, the prosecuting
attorney was bound by his answer and had no right
to assail his credibility by proof of a different state-
ment from him on this collateral matter."

See also, *People* v. *MacCullough* (1937), 281 Mich
15, 24–28, *People* v. *Harvey* (1922), 220 Mich 226,
*Mills* v. *Warner* (1911), 167 Mich 619 and cases
cited therein. The proposed questions designed to
test whether Kupkowski was truthful in describing
his prior contacts with Arn and work for the In-
ternal Revenue Service are clearly of this category.
Others dealing with the nature of those contacts and
unrelated to Kupkowski's credibility are simply ir-
relevant. And those designed to obtain from the wit-
ness his present, or previous expressions of, opinion
about the credibility of Kupkowski do not fall within
the scope of permissible character testimony.

Conviction affirmed.

BURNS, P. J., and HOLBROOK, J., concurred.