# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00746-CV

### V. C., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

#### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
#### NO. D-1-FM-17-003321, HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant V. C. ("Mother") appeals from the trial court's order terminating her parental rights to her daughter K.S. ("Krissy").[1] We will affirm the order of termination.

### Factual Summary[2]

Krissy was born in December 2016 to Mother and R.S. ("Father"). Mother and Father had two sons, twins "Lou" and "Luke," born in March 2015, and Mother has two older children with a different father—those children were born in 2008 and 2011. Mother's other children are not a part of the underlying proceeding or this appeal.

---

[1] For purposes of both clarity and privacy, we will use pseudonyms for the parties involved. *See* Tex. R. App. P. 9.8.

[2] Our recitation of the facts is taken from the Department's filings and the trial testimony.

In May 2017, the Texas Department of Family and Protective Services filed a petition seeking conservatorship of Krissy, explaining that Lou had died while in Father's care as a result of a severe brain injury, that Lou's body "was covered in bruises," and that he had "sustained numerous fractures to his abdomen, all of which were consistent with physical abuse as per medical staff." An autopsy showed that he died due to a "global brain injury" and that he had a skull fracture, rib fractures that were probably approximately a month old, retinal hemorrhages, a liver laceration, intestinal bruising, and bruises on his scalp, face, chest, abdomen, back, and leg.

The Department explained that it had been involved with the family since October 2015, when it received allegations that Lou was being abused. When Lou was admitted to the hospital in 2015 due to difficulty breathing, the hospital staff noticed that he had a subdural hematoma and retinal hemorrhages, which were consistent with "high velocity force," and bruises on his neck and ears. The Department sought conservatorship, and Lou and Luke, who were about six months old at the time, were ordered removed from Mother and Father's care for about a year and a half. They were placed back with Mother and Father in a monitored return in March 2017, and Lou died about two months later. The Department said that in an interview after Lou's death, Mother said that Lou recently had been "pooping blood," for which she said prune juice helped. She also said that Lou "would get bruises a lot on his stomach, but she figured it was because the kids play rough." The Department said it had concerns about Mother's parenting abilities because Mother "fails to comprehend the severity of [Lou's] injuries and the Department's concerns with [Father] as a parent" and had denied all allegations of physical abuse by Father.

2

Mother testified that she had seen bruises on Lou's stomach and blood in his stool and that she believed that the bruises were from playing with his siblings and that the blood was due to constipation. She explained that she had made a doctor's appointment about the constipation, set for several days after Lou died, and that the clinic had told her to give Lou prune juice in the meantime. She said it had not crossed her mind that the bruises and blood were signs of abuse or that "he was being injured by someone." Mother further testified that it never occurred to her that Father was injuring Lou because she never saw Father frustrated or violent and "when I saw him with the children, he was a loving father with them." Mother also testified that after Lou's 2015 hospitalization, the Department never told her to leave Father or that Father was dangerous.

Mother admitted at trial that in July 2017, even after hearing a medical examiner's enumeration of Lou's injuries, she still said she did not know if Father had caused the injuries. Mother said that she testified at a November 2017 hearing that she believed Lou had died from a brain disease because she "didn't hear about all the injuries until" that hearing and because "I'm not—you know, in the medical field, I don't know." However, after that November 2017 hearing, she had cut off all contact with Father because "[e]verything changed. You know, I don't know whether he's innocent or he's guilty. I don't want to have anything to do with him. I don't want to know anything about it." Mother was asked several times whether she believed Father had injured Lou or caused his death, and she provided answers along the lines of, "I don't know, because I didn't see anything. I was not in the room."

After the jury returned a verdict finding that Mother's parental rights to Krissy should be terminated, the trial court signed an order of termination.

**Discussion**

Mother's sole issue on appeal is that the decision that her rights should be terminated "was based on testimony elicited in violation of Appellant Mother's constitutional right against self-incrimination" and specifically that she "was forced at trial to choose between admitting the Father murdered [Lou] (and expose herself to possible criminal prosecution), or face termination of her parental rights to [Krissy]." She argues that the Department's questions exposed her to "reasonable fear of criminal prosecution for perjury, or worse," explaining that she was not present when Lou was injured and "could not tell them what she did not know" and further asserting that because she had "previously testified under oath that she believed [Lou] died of a natural medical condition," admitting in this proceeding that she "knew the Father murdered [Lou] would" provide a basis for perjury charges and even the possibility of accomplice liability.

However, during trial, Mother never attempted to invoke or even refer to her Fifth Amendment rights or any concerns that she was being asked to incriminate herself, nor did her attorney ever raise such concerns. The only reference to incriminating evidence was when Mother was asked why, during recorded conversations with Father while he was in jail awaiting trial for Lou's death, she never asked him what had happened to Lou. She answered that her attorney had told her that "we can't talk anything about the case." The Department asked, "So you were worried that he was going to incriminate himself on a phone call," and she replied, "No." From the appellate record before us, it does not appear that Mother ever raised concerns about her right against self-incrimination in the trial court.

4

Although a witness may assert her Fifth Amendment right against self-incrimination in a civil trial if she is asked a question that might tend to subject her to criminal responsibility, the jury may make negative inferences based upon the assertion of the privilege.[3] *Texas Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995) (quoting *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924), and citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).  Further, a blanket assertion of the privilege is impermissible.  *In re Commitment of Chapman*, No. 09-11-00561-CV, 2013 WL 4773231, at *10 (Tex. App.—Beaumont Sept. 5, 2013, pet. denied) (mem. op.); *In re Commitment of Browning*, 113 S.W.3d 851, 862 n.10 (Tex. App.—Austin 2003, pet. denied).  Because the trial court must determine whether the assertion of the privilege is in good faith and justifiable under the circumstances, the privilege must be asserted in response to each specific question or it is waived.[4]  *In re Commitment of Lowe*, 151 S.W.3d 739, 745 (Tex. App.—Beaumont 2004, pet. denied); *In re Verbois*, 10 S.W.3d 825, 828 (Tex. App.—Waco 2000,

[3]  The State may not, however, obtain "an adverse judgment against a party to a civil proceeding solely because that party refuses to testify on the basis of the privilege against self-incrimination." *In re Verbois*, 10 S.W.3d 825, 829 (Tex. App.—Waco 2000, orig. proceeding).

[4]  Our sister court in *Verbois* addressed a situation similar to this case, in which parents against whom the Department initiated a termination proceeding after the death of a child were ordered to undergo psychological evaluations that they asserted required them either to give up the privilege or to assert their Fifth Amendment rights, thus creating a ground for termination. *Id.* at 827.  The court concluded, "The Hobson's choice which Relators argue they are being forced to make has not yet come into existence because Relators have failed to . . . identify[] any specific inquiries propounded by the psychologist which they believe would require an incriminating response." *Id.* at 830 (citing *Ex parte Butler*, 522 S.W.2d 196, 198-99 (Tex. 1975)).  The court explained that the proper procedure in such a case is to refuse to answer on grounds of the privilege in response to a question that the parent believes requires an incriminating answer, allow the trial court to consider whether the refusal is justified under the circumstances, and seek extraordinary relief if the court orders the parent to answer. *Id.*

5

orig. proceeding); *In re Speer*, 965 S.W.2d 41, 46 (Tex. App.—Fort Worth 1998, no pet.); *Gebhardt v. Gallardo*, 891 S.W.2d 327, 330 (Tex. App.—San Antonio 1995, no writ).

Mother did not object on Fifth Amendment grounds to any specific questions. The privilege against self-incrimination "is not self-executing; it is a privilege that must be asserted." *In re Commitment of Mullens*, 92 S.W.3d 881, 888 (Tex. App.—Beaumont 2002, pet. denied). "Instead, the privilege must be asserted on a question-by-question basis," *Browning*, 113 S.W.3d at 862 n.10, and the trial court "must forecast whether an answer to the question could tend to incriminate the witness in a crime," which might be apparent in some cases but in other cases might require the witness to "reveal enough to demonstrate hazard without revealing the very information he or she seeks to conceal," *Speer*, 965 S.W.2d at 45. Because Mother did not raise her concerns and allow the trial court to assess whether she was asserting her Fifth Amendment rights in good faith under the circumstances, she has not preserved the issue for appellate review.[5] *See Browning*, 113 S.W.3d at 862 n.10.

Further, even if Mother had not waived the issue, the record does not support Mother's assertions that she was presented with a choice of either admitting that she knew Father had killed Lou or losing her parental rights to Krissy. The Department sought termination because

---

[5] Mother does not directly address the issue of error preservation, but she touches on it by citing to *Hoffman v. United States*, in which the Supreme Court stated, "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. 479, 486-87 (1951). However, unlike this case, *Hoffman* was a criminal case discussing the details a criminal defendant must provide in "interposing his claim" of Fifth Amendment privilege. *Id.* at 486. Further, in *Hoffman*, the criminal defendant actually asserted the privilege in response to specific questions asked before a grand jury. *Id.* at 481-82.

it believed Mother had shown herself unwilling or unable to protect her children from harm at the hands of others, arguing in part that Mother could not explain Lou's death, continued to have contact with Father well after Lou's death and after the extent of his injuries was disclosed, and seemed unwilling to accept that Father had caused the fatal injuries. However, Mother was not asked at trial to admit that she *knew* Father had killed Lou—she was asked whether she *believed* he had.[6] Mother was also asked several times if she had ever asked Father what happened to Lou, and she responded that she had not asked, that she had not had the time to ask, and that her focus at the time was on Lou, not on Father or on how Lou had been injured.

The Department's argument was clear in this proceeding. For instance, a Department caseworker testified that the Department might have a different view of Mother's parenting abilities if shortly after Lou's death, she had come to the Department and said, "I think that [Father] murdered my son." The caseworker also said that she did not believe the Department was holding Mother responsible for leaving Lou with Father while she was out of the house. She explained,

> I don't feel like we're holding it against her that she's not saying that he did it. I feel like, for our part, the part that's concerning is that she won't say that he could have done it. He could have been the one that inflicted the injuries upon [Lou]. That's the department's concerns.[7]

---

[6] The Department asked, "As you're sitting here today, do you *believe* that [Father] killed your son," and she replied, "I don't *know* what—what happened because I was not present. . . . [W]hether he did it or not, that's going to be part of the criminal system, and they will do their job there." (Emphases added.)

[7] We note that the record seems to support the Department's concerns that Mother was reluctant to admit the possibility that Father had injured Lou—when asked whether Lou was injured while she was away from the house, Mother answered, "He *became ill* when I was not there, correct." (Emphasis added.)

7

On this record, we hold that, even if the issue was properly before us, Mother was not presented with the Hobson's choice she asserts or asked questions that might have placed her in criminal jeopardy.[8] We overrule Mother's sole issue on appeal.

## Conclusion

We have overruled Mother's issue on appeal. We therefore affirm the trial court's order of termination.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: March 28, 2019

_____

[8] The testimony to which Mother points as showing that she was asked to perjure herself was testimony from Department witnesses stating that the Department was concerned about Mother's parenting abilities because she had "continue[d] to state that [Lou's] death was a result of a natural disease's process even after hearing medical evidence to the contrary"; that in an earlier hearing, Mother's "continued explanation was that it was all due to natural causes"; and that although the Department's concerns would be alleviated if Mother "testified under oath that [Father] did it," it would be perjury to testify "that she knows something that she doesn't know." Such testimony does not show that the Department had asked her to testify that she knew what had happened to Lou despite being elsewhere at the time of his fatal injury or required her to contradict earlier testimony given under oath.