

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00256-CV

_____

IN THE INTEREST OF B.C. AND Z.C., CHILDREN

---

On Appeal from the 97th District Court
Montague County, Texas
Trial Court No. 2021-0086M-CV

---

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

In two issues with various subissues, Appellant Father appeals the trial court's judgment terminating his parental rights to his children, B.C. and Z.C.[1]  Father contends that the trial court erred by depriving him of (1) his right to appointed counsel and (2) his privilege against self-incrimination.  We will affirm.

## I.  BACKGROUND

### A.  PROCEDURAL BACKGROUND

Based on concerns that Mother, Father, Paternal Grandmother, and Paternal Grandmother's boyfriend were using illegal drugs in the home with the children, and because of concerns that boyfriend might have engaged in sexual misconduct with B.C., the Texas Department of Family and Protective Services (Department) filed its March 24, 2021 petition seeking termination of Father's parental rights to B.C. and Z.C.[2]  The only alleged conduct ground was that Father had "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed]" their physical or emotional well-being.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D).  That same day, the trial court entered its ex parte emergency

---

[1]We refer to the children using their initials and to other family members by their relationship to the child.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The Department also sought and obtained termination of Mother's parental rights to the children upon the grounds that she had filed an unrevoked or irrevocable affidavit of relinquishment.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K).  Mother is not a party to this appeal.

order naming the Department as temporary managing conservator of the children. The order also informed the parents that they may be entitled to appointed counsel:

> YOU HAVE THE RIGHT UNDER §262.102(d), TEXAS FAMILY CODE, TO BE REPRESENTED BY AN ATTORNEY. IF YOU ARE INDIGENT AND UNABLE TO AFFORD AN ATTORNEY, YOU HAVE THE RIGHT TO REQUEST THE APPOINTMENT OF AN ATTORNEY BY CONTACTING THE COURT AT 97TH JUDICIAL DISTRICT COURT OF MONTAGUE COUNTY, 900 7TH STREET, ROOM 401, WICHITA FALLS, TEXAS 76301, (940) 716-8624. IF YOU APPEAR IN OPPOSITION TO THE SUIT, CLAIM INDIGENCE, AND REQUEST THE APPOINTMENT OF AN ATTORNEY, THE COURT WILL REQUIRE YOU TO SIGN AN AFFIDAVIT OF INDIGENCE AND THE COURT MAY HEAR EVIDENCE TO DETERMINE IF YOU ARE INDIGENT. IF THE COURT DETERMINES YOU ARE INDIGENT AND ELIGIBLE FOR APPOINTMENT OF AN ATTORNEY, THE COURT WILL APPOINT AN ATTORNEY TO REPRESENT YOU.[3]

On April 16, 2021, an adversary hearing was held at which Father appeared via Zoom without an attorney. *See id.* § 262.201. After this hearing, the trial court entered temporary orders that contained a notice—identical to the one referenced above—to the parents of their right to appointed counsel.

On May 20, 2021, a status hearing was held at which Father did not appear. *See id.* § 263.201. On September 16, 2021, an initial permanency hearing was held at which Father did not appear. *See id.* § 263.304. And on January 5, 2022, a subsequent permanency hearing was held at which Father appeared from jail via Zoom and

---

[3]This order also appointed an attorney for Mother but not for Father.

without an attorney.[4] *See id.* § 263.305. The trial court ordered that Father be provided that same day with an indigency affidavit form to determine whether he was eligible to receive appointed counsel. On January 6, 2022, based on the information Father had provided in this affidavit, the trial court appointed attorney Tiffany Fowler to represent him. Citing the need for more time to prepare for trial, Fowler moved for an extension of the case dismissal deadline, which the trial court granted.

On May 26, 2022—less than a week before the start of trial—Fowler filed a written motion to withdraw as counsel for Father on the grounds that Father "no longer wishe[d] to be represented by Tiffany Fowler and wishe[d] to represent himself or be appointed new counsel." At the commencement of the trial on June 1, 2022, Fowler orally moved for a continuance and presented her motion to withdraw as counsel, citing Father's displeasure with their "inability to effectively communicate." Fowler explained to the trial court that she had attempted to meet with Father before trial at the jail where he was incarcerated but that Father had refused to speak with her and instead asked her to file the motion to withdraw. The trial court denied both motions.

Before testimony started on the second day of trial on June 24, 2022, Fowler re-urged her motion to withdraw as counsel for Father, stating that it was her

---

[4]The orders entered after the May 20, September 16, and January 5 hearings did not contain a notice to the parents of their right to appointed counsel. There is no transcript of these hearings in the appellate record.

understanding that Father wished to represent himself. In response to questions from the trial court, Father said that he had never told Fowler that he wanted to represent himself, only that he "would rather represent himself than have [Fowler] represent [him]." This was because he had asked Fowler to "file a motion" for him to have virtual visitation with the children from jail that Fowler had declined to file. He told the trial court that he had met with Fowler three times regarding the case and that he was aware that Fowler had arranged for witnesses to appear at trial on Father's behalf. When asked if he had another attorney lined up to represent him, Father answered, "No. That's their job to appoint one to me."

Fowler acknowledged that she did not file a formal motion for virtual visitation, citing a trial court policy regarding children visiting incarcerated parents. However, she did make the request directly to the Department which was denied. The trial court again denied the motion to withdraw.

After a bench trial, the trial court found by clear and convincing evidence that Father had violated ground (D) and that termination was in the best interest of the children. *See id.* § 161.001(b)(1)(D), (2).

## B. TRIAL EVIDENCE

### 1. James Gibbs's Testimony

Gibbs, an investigator for the Department, testified that the Department became involved with B.C. and Z.C. in March 2021 after receiving a neglectful supervision intake related to alleged illegal drug use in the home. Gibbs went to

Paternal Grandmother's residence, where she lived with her boyfriend, Mother, Father, and the children. Father was in the front yard with B.C. and Mother when Gibbs arrived. Father told Gibbs that Paternal Grandmother's boyfriend may have engaged "in some type of inappropriate behavior with the children." Gibbs informed Father that there had been allegations of drug use in the home and asked Father to submit to a drug test. Father told Gibbs that he would fail a drug test because he had been "living the bachelor lifestyle." Based on concerns about drug use in the home and the allegations of the boyfriend's sexual misconduct with the children, the Department removed the children from the home.

### 2. Father's Testimony

### a. Removal

Father, testifying from jail, denied that he told Gibbs that he would test positive if he was drug tested. He admitted that he knew that Paternal Grandmother and her boyfriend were using methamphetamines while Father, Mother, and the children lived in Paternal Grandmother's home. Though he invoked the privilege against self-incrimination when asked about his drug use at the time of removal, Father also acknowledged that he had "a history of substance abuse problems" and "an addicted [sic] personality."

Father stated that he was concerned that Paternal Grandmother's boyfriend had sexually abused B.C. because of suspicious behavior Father had observed one night while B.C. was asleep and because of "the way [boyfriend] carried himself

6

around [B.C.]." Father also conceded that Z.C., who was born in October 2020, had never been taken to the doctor between his birth and the children's removal in March 2021.

For most of the case—about nine months—Father had been incarcerated in multiple counties for charges including assault of a police officer, attempt to take a weapon, felony evading arrest with a vehicle, burglary of a habitation, three misdemeanor resisting arrests, and failure to identify.[5] Due mainly to these incarcerations, Father had visited with his children only four times since their removal.[6] While incarcerated, Father underwent a mental health assessment and was diagnosed as being bipolar, but he characterized this diagnosis as merely "one person's opinion," which he "did not follow." Father did not know where he would live after release from incarceration but testified that he desired to go to rehab and had applied for acceptance into a one-year treatment program.

### b. Appointment of Counsel

Father testified that he first requested a court-appointed attorney at the April 16, 2021 adversary hearing. However, he was not appointed an attorney until

---

[5]Father's criminal history also included felony convictions for burglary of a building, unauthorized use of a vehicle, and possession of methamphetamine. These convictions all occurred between 2011 and 2015, before the births of his children.

[6]Father also explained that he had decided to stop attending the visitations after observing the distress placed upon B.C. when she was forced to leave him at the end of the visits.

January 6, 2022. He estimated that, during the pendency of the case, he had made at least a dozen requests for a court-appointed attorney, either by asking his caseworker or the trial court directly.[7] At one point, Father's caseworker had explained to Father that the trial court had initially determined that Father was ineligible for an appointed attorney based on Father's self-reported income.

### c. Fifth Amendment

Father invoked his privilege against self-incrimination to a number of questions, including:

1. Had he ever pushed, shoved, or hit Mother or thrown anything at her?

2. Was he actively using methamphetamines at the time of the removal of the children in March 2021?

3. Was Mother actively using methamphetamines in March 2021?

4. Did B.C. test positive for methamphetamines?[8]

The State objected to Father's assertion of the privilege in response to question three, arguing that Mother's drug use did not incriminate Father. Father's attorney argued that his answer to that question could be deemed incriminating if Father was charged with "injury to a child or something like that if the children were [] in his

---

[7]According to Father, he also submitted "multiple paperworks [sic]" requesting a court-appointed attorney for which he never received a response.

[8]The clerk's record contains a drug test result that appears to show that B.C. had tested positive for methamphetamines after being tested on March 30, 2021. Direct evidence of these test results, however, was not admitted as evidence at trial.

care."[9] The trial court ordered Father to answer the question and Father testified that Mother had been using methamphetamines in March 2021. Father was not ordered to answer questions one, two, and four.

### 3. Tony Gilliland's Testimony

Gilliland was Father's caseworker and testified that Father was "angry throughout most of th[e] case." Communicating with Father was difficult because Father would often respond angrily and because the Department often did not know his whereabouts. Also, at visitations Father would sometimes arrive late, leave early, and scream and cuss at the Department's staff.

Gilliland agreed that Father had asked him several times for a court-appointed attorney and that he had explained to Father that the trial court had determined that he was ineligible for an attorney based on the wages Father had reported at the adversary hearing. But Gilliland also explained to Father that he could "reapply" for appointed counsel—which Father did after the trial court ordered that he be provided with an indigency form in January 2022.

---

[9]The record does not show that Father had ever faced a criminal charge of injury to a child, but it does show that he had been arrested for abandoning and endangering a child with criminal negligence on June 24, 2021, apparently for the same alleged actions underlying this case. The Department reported that this charge had been dismissed, but there is no indication whether the dismissal was with or without prejudice.

### 4. Nora Nevarez's Testimony

Nevarez, who worked as a permanency supervisor for the Department, testified that she met with Father on May 12, 2021, and asked him if he would like to apply for a court-appointed attorney. Father declined the application, explaining to Nevarez that he and Mother were a couple and that he was satisfied with how the case was being handled by her appointed counsel. According to Nevarez, the trial court asked unrepresented parents at every court appearance whether they were okay proceeding without a court-appointed attorney. Nevarez also witnessed Father's anger and had to "often" calm him down when he would become disruptive at the Department offices.

### 5. Brian Evans's Testimony

Evans testified as a witness for Father. He said that he was Father's former employer at a wheel-repair business and described Father as a "very hard worker" and a "good parent." Evans explained that he started having concerns about Father's drug use when Father moved into Paternal Grandmother's house:

> "That's when [Father] started using. It's a cycle for [Father]. Whenever [Father] moves back to his mom's and his mom gets involved in [Father's] life—I mean, I've explain[ed] it to [Father] several times. It's a cycle for [Father]."

The last time that Evans had seen Father with the children was "two or three days before" the children were removed in March 2021. Evans could tell that Father was using drugs and told Father that "he needed to get himself clean and get away from his mom."

### 6. Frankie Pair's Testimony

Pair also testified as a witness for Father. He stated that Father had worked for him and described Father as a "hard worker." Also, Pair had been friends with Paternal Grandmother, and the two used to do drugs together when Father was a baby. According to Pair, he had not seen Father in "some time" because Pair, as a recovering addict, did not allow himself to be around "anybody that's using."

## II.  DISCUSSION

### A.  RIGHT TO COUNSEL

In his first issue, Father argues that the trial court violated his due process rights in three ways: (1) by failing to appoint an attorney for him for the majority of the litigation, (2) by failing to inform him of his right to legal representation, and (3) by failing to consider appointing him a different attorney once a conflict arose between Father and Fowler.

### 1.  The Trial Court's Appointment Was Timely

Father argues that the trial court violated his due process rights by failing to appoint him with counsel "for the first 9.5 months of the litigation." However, the record shows—and Father concedes in his appellate brief—that Father did not file an affidavit of indigency until after the January 5, 2022 hearing. This is fatal to Father's complaint.

There is no doubt that an indigent parent is entitled to appointed counsel when the government initiates a suit to terminate his parental rights. *See* Tex. Fam. Code

11

Ann. § 107.013(a); *In re B.C.*, 592 S.W.3d 133, 134 (Tex. 2019). When a parent claims indigence, the trial court must appoint him with counsel if the trial court determines that he is in fact indigent. *B.C.*, 592 S.W.3d at 134. However, the trial court may not make this determination until the parent has filed an affidavit of indigence in accordance with the Texas Rules of Civil Procedure. *Id.* (citing Tex. Fam. Code. Ann. § 107.013(d); Tex. R. Civ. P. 145(b)); *see* Tex. Fam. Code Ann. § 263.0061(b).

Here, there is no dispute that Father appeared at the April 16, 2021 adversary hearing, that he requested appointed counsel without filing an affidavit of indigency, and that the trial court denied his request based on Father's reported income. Likewise, it is undisputed that Father did not appear before the trial court again until the January 5, 2022 permanency hearing on the eve of the initial trial setting. At this hearing, Father again requested appointed counsel and was promptly provided with a copy of the indigency affidavit, which he completed and returned. The trial court appointed him with counsel the next day and soon after granted Father a trial continuance and extended the dismissal date so that his attorney could prepare for trial.

Thus, the record is clear that the trial court was not presented with a valid indigency affidavit until January 5, 2022. It had no authority to appoint Father an attorney until that time. *See B.C.*, 592 S.W.3d at 134. Accordingly, we hold that the trial court did not err by not appointing Father counsel until January 6, 2022.

## 2. The Trial Court Adequately Informed Father of His Right to Legal Counsel

Next, Father contends that the trial court failed to provide him with adequate statutory notice of his right to appointed counsel as required by Section 263.0061(a) of the Texas Family Code. Because it is so brief, we will reproduce the entirety of Father's appellate argument on this point:

> No statutory warnings appear to have been given to the unrepresented Father. *See* Tex. Fam. Code Ann. § 263.0061(a); [record cite] (Status Hearing Order), [record cite] (Initial Permanency Order), [record cite] (Subsequent Permanency Hearing Order).[10]

Thus, Father appears to argue that the trial court violated Section 263.0061(a)'s notice requirements simply because the written orders entered after the status, initial permanency, and subsequent permanency hearings did not contain a notice informing the parents of their right to appointed counsel. We disagree.

Section 263.0061 requires trial courts to, "[a]t the status hearing . . . and at each permanency hearing," inform unrepresented parents of "(1) the right to be represented by an attorney; and (2) if a parent is indigent and appears in opposition to the suit, the right to a court-appointed attorney." Tex. Fam. Code Ann. § 263.0061(a). It is true that none of the three referenced orders contain a notice of the parents' right to appointed counsel. It is also true, however, that Section 263.0061 says nothing

---

[10]Though Father flirts with waiving this complaint through inadequate briefing, *see Craaybeek v. Craaybeek*, No. 02-20-00080-CV, 2021 WL 1803652, at *5 (Tex. App.— Fort Worth May 6, 2021, pet. denied) (mem. op.), we will consider it in light of our directive to liberally construe the briefing rules. Tex. R. App. P. 38.9.

about what notices must be contained in the trial court's written hearing orders, and Father points to no such authority. Instead, Section 263.0061 requires a trial court to provide said notice to the parents "at" the hearings in question.

On this point, Father does not complain that the trial court failed to give him notice *at* the adversary and subsequent permanency hearings—the only two hearings at which he appeared. And it is difficult to envision how the trial court could have admonished Father of his rights at the hearings at which he failed to appear.

Further, even if Father had raised such a complaint, nothing in the record before us—which does not contain any transcripts of the pretrial hearings—shows that the trial court failed to give him notice at the hearings. Instead, the record indicates that Father likely *did* receive adequate notice because Father sought to invoke his right to appointed counsel at each of the two hearings at which he was present. Also, Nevarez testified that the trial court had inquired into the status of the parents' legal representation at "every court hearing."

For these reasons, we hold that Father has not shown that the trial court failed to inform him of his right to appointed counsel.

### 3. No Abuse of Discretion in Denying Motion to Withdraw

Father argues that the trial court violated his due process rights by denying Fowler's requests to withdraw. These denials, Father says, deprived him of his right to effective assistance of counsel at trial, particularly because he was not given the

14

opportunity to explain to the trial court the reasons why he and Fowler were not effectively communicating. Again, we disagree with Father.

We review trial court rulings on the withdrawal or substitution of appointed counsel for an abuse of discretion. *In re C.F.*, 565 S.W.3d 832, 843 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see Burgess v. State*, 816 S.W.2d 424, 428 (Tex. Crim. App. 1991).[11] A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). A trial court is not required to search for counsel agreeable to the indigent party, and "personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal." *King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000). Further, the right to counsel may not be used to obstruct the judicial process or to interfere with the efficient, prompt administration of justice. *Id.*; *see Carroll v. State*, 176 S.W.3d 249, 256 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd).

---

[11]Though civil in nature, Texas courts often seek guidance from criminal cases when analyzing issues related to appointed counsel in parental-rights-termination cases. *See, e.g., In re D.T.*, 625 S.W.3d 62, 73–75 (Tex. 2021); *In re M.S.*, 115 S.W.3d 534, 549–50 (Tex. 2003); *In re Howell*, No. 14-19-00611-CR, 2019 WL 3795999, at *2 (Tex. App.—Houston [14th Dist.] Aug. 13, 2019, orig. proceeding) (mem. op., not designated for publication) (per curiam); *In re G.H.*, No. 02-14-00261-CV, 2015 WL 3827703, at *17–18 (Tex. App.—Fort Worth June 18, 2015, no pet.) (mem. op. on reh'g); *Walker v. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 624–25 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

15

The trial court's denials of Fowler's motions to withdraw were not arbitrary or unreasonable. The first evidence in the record of any disagreement between Father and Fowler came by way of Fowler's written motion to withdraw filed less than a week before the commencement of trial. At that point, the trial court had already granted Father a continuance and new dismissal date for the case. It would not have been unreasonable, under these circumstances, for the trial court to have concluded that Father's eleventh-hour request for new counsel was a delay tactic. *See Elder v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-10-00876-CV, 2011 WL 4424299, at *3 (Tex. App.—Austin Sept. 20, 2011, no pet.) (mem. op).

Beyond this, the record shows that Father was generally difficult to communicate with. Fowler informed the trial court that she had tried to meet with Father at the jail on the eve of trial but was unsuccessful because Father refused to speak with her. Gilliland testified that he, too, had had difficulties communicating with Father and that such attempts were often met with anger. And Nevarez confirmed that Father often became upset and needed to be calmed down during his supervised visitations with the children. Thus, it would have been reasonable for the trial court to conclude that the appointment of a new attorney to rectify Father's communication issues with Fowler would have been futile given Father's persistent inability to communicate effectively with others in his case.

Finally, when the motion to withdraw was re-urged before the second day of testimony began, Father told the trial court that he wanted new representation

16

because Fowler had declined to file a motion to allow Father to have virtual visitation with his children from jail. But Father points to no actual deficiency in Fowler's representation at trial and agreed that he had met with her three times prior to trial, that Fowler had scheduled for witnesses to testify on Father's behalf, and that he had no substitute counsel available despite his desire not to represent himself. The record also shows that, upon her appointment, Fowler was present at all scheduled hearings, filed various motions, attended mediation, cross-examined witnesses, and logged reasonable objections during the first day of trial. For these reasons, the trial court could have reasonably concluded that Father's issues with Fowler were a mere conflict of personalities rather than any deficiency in representation that would have prejudiced Father at trial. *See Cavaness v. State*, No. 04-17-00517-CR, 2018 WL 3747809, at *5 (Tex. App.—San Antonio Aug. 8, 2018, pet. ref'd) (mem. op., not designated for publication).

Accordingly, we conclude that the trial court did not abuse its discretion when it denied Fowler's motions to withdraw. We overrule Father's first issue.

## B. PRIVILEGE AGAINST SELF-INCRIMINATION

In his second issue, Father argues that the trial court violated his Fifth Amendment rights by ordering him to answer, over his invocation of the privilege, whether Mother had been using drugs at the time of the children's removal.[12]

---

[12]In his appellate brief, Father also summarily argues that the trial court inadequately explained to him his right against self-incrimination. We overrule this

17

Specifically, he contends that this answer could incriminate him if he were to be prosecuted for the offense of abandoning or endangering a child. We overrule this issue because, even though the trial court erred by requiring Father to answer this question, such error was not reversible. *See* Tex. R. App. P. 44.1(a).

### 1. The Trial Court Erred

A witness may invoke his privilege against self-incrimination in civil cases whenever an answer might tend to subject him to criminal responsibility. *In re Speer*, 965 S.W.2d 41, 45 (Tex. App.—Fort Worth 1998, orig. proceeding); *see In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *4 (Tex. App.—Fort Worth Nov. 9, 2017, pet. denied) (per curiam) (mem. op.) (stating that a "termination trial is a civil proceeding for purposes of the privilege against self-incrimination"). When a witness invokes the privilege, the trial court must determine whether the invocation appears to be made in good faith and is justifiable under all of the circumstances. *Speer*, 965 S.W.2d at 45. "The inquiry by the court is necessarily limited because the witness need only show that a response is likely to be hazardous to him." *Id.* Before requiring a witness to answer, the trial court must be "'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and

argument for two reasons. First, Father waived this argument through inadequate briefing because he provides no authority or argument on the issue. Tex. R. App. P. 38.1(i). Second, the trial court *did* adequately inform Father on the record that he had the right to not testify concerning anything that would incriminate him and that, if Father did so, the trial court had the right to make negative inferences from those invocations.

18

that the answer(s) cannot possibly have such tendency' to incriminate." *Ex parte Butler*, 522 S.W.2d 196, 198 (Tex. 1975) (quoting *Hoffman v. United States*, 341 U.S. 479, 488, 71 S. Ct. 814, 819 (1951)). However, the factfinder in a civil trial may draw negative inferences based upon a witness's assertion of the privilege. *Speer*, 965 S.W.2d at 46 (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976)).

Under the circumstances of this case, it was reasonable for Father to fear that answering the question about Mother's drug use was likely to be hazardous to him and could tend to be incriminating. Father was arrested for abandoning and endangering a child based on the same nexus of facts underlying his termination case—that Father had allowed the children to remain in the care of people who were using methamphetamines. Section 22.041 of the Texas Penal Code provides that

> (b) A person commits an offense [of abandoning or endangering a child] if, having custody, care, or control of a child younger than 15 years, he intentionally abandons the child in any place under circumstances that expose the child to an unreasonable risk of harm.
>
> (c) A person commits an offense [of abandoning or endangering a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment.
>
> (c-1) For purposes of Subsection (c), it is presumed that a person engaged in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment if:
>
> . . . .

(2) the person's conduct related to the proximity or accessibility of the controlled substance methamphetamine to the child and an analysis of a specimen of the child's blood, urine, or other bodily substance indicates the presence of methamphetamine in the child's body . . . .

Tex. Penal Code Ann. § 22.041.

If Father knew that Mother was using methamphetamines and he still allowed the children to remain in her care, a strong argument could be made that Father violated Subsection (b). *See id.* 22.041(b). Furthermore, the Department had filed documentation with the trial court showing that B.C. had tested positive for methamphetamines. Because of this, Father could have also reasonably feared prosecution under Subsection (c-1)(2). See *id.* § 22.041(c-1)(2).

The Department argues that "it was reasonable for the trial court to have concluded that [Father]'s answer would not likely incriminate him" because Father's endangerment charge was dismissed and because Father did not present specific evidence to the trial court regarding that charge. These arguments are unavailing.

First, there is no indication that the charge was dismissed with prejudice and, therefore, the State could have refiled it anytime within the applicable statute of limitations—this time bolstered by Father's statements made under oath. *See* Tex. Code Crim. Proc. Ann. art. 12.01(4)(D) (providing a five-year statute of limitations for abandoning or endangering a child). Second, documents in the clerk's record strongly suggest that the trial court knew that Father had been arrested for abandoning or endangering a child and that B.C. had tested positive for methamphetamines. *See In re*

20

*J.E.H.*, 384 S.W.3d 864, 869 (Tex. App.—San Antonio 2012, no pet.) (explaining that "a trial court is presumed to judicially know what has previously taken place in the case tried before it") (internal quotations omitted).

For these reasons, we conclude that the trial court erred by making Father answer whether Mother was using drugs in March 2021 because Father was justified in believing that his answer could tend to incriminate him.

### 2. The Error Is Not Reversible

Our inquiry does not end, though, with the conclusion that the trial court erred; we must also determine whether the error was reversible. *See* Tex. R. App. P. 44.1(a). In civil cases, an error is reversible only if it "(1) probably caused the rendition of an improper judgment" or "(2) probably prevented the appellant from properly presenting the case to the court of appeals." *Id.* This rule applies to all errors that occur in civil cases. *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011). Because the error did not prevent Father from presenting the case on appeal, we will focus our inquiry on whether it probably caused the rendition of an improper judgment. We conclude that it did not.[13]

---

[13]We note that Father has likely waived this issue by failing to address how this error led to an improper judgment. *See Mullendore v. Muehlstein*, 441 S.W.3d 426, 430 (Tex. App.—El Paso 2014, pet. denied) (explaining that the civil appellant bears the burden of showing harm and waives the issue by failing to do so); *In re K.C.R.T.*, No. 02-10-00425-CV, 2011 WL 3426258, at *7 (Tex. App.—Fort Worth Aug. 4, 2011, no pet.) (mem. op.) (same). But given the weighty nature of the issue as one that touches upon both parental and constitutional rights, we will perform a harm analysis.

The trial court found by clear and convincing evidence that Father had "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed]" their physical or emotional well-being[14] and that termination was in their best interest.[15] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (2). There was ample evidence—separate from Father answering affirmatively that Mother had been using methamphetamines at the time of removal—to support these findings:

- Father told Gibbs on the day of removal that Father would fail a drug test that day;

- Father admitted to knowing that Paternal Grandmother and her boyfriend were using methamphetamines while the children lived in the home;

- Father admitted that Z.C. did not see a doctor for the first five months of Z.C.'s life;

- Father acknowledged having a history of substance abuse problems;

- Father had been concerned that Paternal Grandmother's boyfriend had sexually abused B.C., but B.C. was still present at the home with boyfriend also present on the day that Gibbs arrived to investigate;

---

[14]The following actions by a parent or other person in the home can support a finding of endangerment under ground (D): inappropriate, abusive, or unlawful conduct, *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); drug use, *In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.); and a parent's prolonged absence due to incarceration, *Walker*, 312 S.W.3d at 617.

[15]Courts must consider the well-known *Holley* factors when making a best-interest determination. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

- Father had been incarcerated for nine of the fifteen months leading up to trial and was still incarcerated at the time of trial;

- Father visited with the children only four times between removal and trial;

- Father declined to follow the recommendations of a mental health professional who had diagnosed him with bipolar disorder;

- Evans testified that he could tell that Father was using drugs two or three days prior to the children's removal and that living in the house with Paternal Grandmother exacerbated Father's problems with substance abuse;

- Pair testified that he had used drugs with Paternal Grandmother and that he had not seen Father in "some time" because Pair did not allow himself to be around people who were actively using drugs; and

- Father did not know where he would live upon being released from custody and indicated a desire to enter a long-term rehabilitation facility.

Additionally, the trial court was free to draw negative inferences from Father's assertions of his Fifth Amendment privilege in response to questions about whether Father had ever physically assaulted Mother, whether Father had been using methamphetamines at the time of removal, and whether B.C. had tested positive for methamphetamines. *See Speer*, 965 S.W.2d at 46.

Thus, even if the trial court had *not* required Father to answer the question about Mother's drug use, there would have been ample evidence to support the trial court's Section (D) and best interest findings. For these reasons, we cannot say that the trial court's error probably caused the rendition of an improper judgment terminating Father's parental rights to the children. *See In re C.E.M.*, 64 S.W.3d 425, 429–30 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (holding in a termination case

23

that any potential error by the trial court in admitting certain evidence did not result in an improper judgment because other evidence supported the judgment).  We overrule Father's second issue.

## III.  CONCLUSION

Having overruled Father's two issues, we affirm the judgment of the trial court.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  November 23, 2022